## CITY OF TOLEDO

v.

## TOLEDO EDISON COMPANY.

2000-Ohio-2696.]

Court of Common Pleas of Ohio,
Lucas County.

No. CI 99–1927.

Decided Sept. 19, 2000.

132

Edward M. Yossem and John T. Madigan, for plaintiff.

Thomas S. Zaremba and Stephen B. Mosier, for defendant.

JUDITH ANN LANZINGER, Judge.

## I. Introduction

{¶ 1} This is a declaratory judgment action brought by the city of Toledo to determine its rights and the consequences if a Special Improvement District ("SID") is authorized to provide electricity to city residents. The complaint contains two counts.[1] The first asks whether an agreement entered into January 28, 1997, with the Toledo Edison Company will be affected if the city creates a

---

1. On November 28, 1998, the Toledo City Council passed Resolution No. 1185–98 to direct the Law Department to commence this action on behalf of the city.

SID to provide electrical service. The second count asks whether "stranded costs" would have to be paid and, if so, how much.

{¶ 2} Defendant Edison has filed a Civ.R. 12(B)(1) motion to dismiss count two of the complaint for lack of subject matter jurisdiction. Edison argues that the matter of stranded costs belongs within the exclusive and primary jurisdiction of the Federal Energy Regulatory Commission ("FERC") and the Public Utilities Commission of Ohio ("PUCO"). The city responds that count two merely seeks a contract interpretation over which a state court has concurrent jurisdiction.

{¶ 3} The standard for review under Civ.R. 12(B)(1) is whether a plaintiff has alleged any cause of action which the court has authority to decide. *McHenry v. Indus. Comm.* (1990), 68 Ohio App.3d 56, 62, 587 N.E.2d 414; *State ex rel. Bush v. Spurlock* (1989), 42 Ohio St.3d 77, 80, 537 N.E.2d 641. In determining whether a plaintiff has alleged a cause of action sufficient to withstand this motion, a court is not confined to the allegations of the complaint but may consider pertinent material without converting the motion into one for summary judgment. *Southgate Dev. Corp. v. Columbia Gas Transm. Corp.* (1976), 48 Ohio St.2d 211, 2 O.O.3d 393, 358 N.E.2d 526, paragraph one of the syllabus.

{¶ 4} After due consideration, the court agrees with defendant Edison that a state common pleas court has no subject matter jurisdiction over count two, and therefore dismisses the count with prejudice.

## II. Background

{¶ 5} On January 28, 1997, the city and Edison entered into an agreement whereby among other things, Edison agreed to pay the city $1.3 million per year beginning January 1, 1998, for five years, as long as the city did not sell or engage in the business of furnishing electric service to any Edison customer. The parties agree that their contract does not specifically address Special Improvement Districts ("SIDs")[2] as a vehicle for providing electricity; thus, this lawsuit for declaratory judgment under R.C. Chapter 2721.

{¶ 6} Edison's motion seeks dismissal of Count Two, which relates to the potential recovery of stranded costs if and when a customer chooses to receive

---

2. According to the city, any SID to be created would be formed by city residents pursuant to R.C. Chapter 1710. The SID would then sell electric power to customers using the authority granted to a municipality under Section 4, Article XVIII of the Ohio Constitution: "[A]ny municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such products or service."

electric power from a source other than Edison. Count Two of the complaint states:

{¶ 7} "19. Toledo Edison has taken the position that any utility created to sell electricity to its customers must pay stranded costs consisting of costs incurred by Toledo Edison to serve those customers.

{¶ 8} "20. Toledo maintains that Toledo Edison had no reasonable expectation to continue serving any customers in the City of Toledo because Toledo Edison has known since 1989 that Toledo was considering the creation of a municipal electric utility and that, therefore, no stranded costs are owed to Toledo Edison.

{¶ 9} "21. Toledo Edison has not disclosed the amount of stranded costs that it alleges would be owed by residents of the City of Toledo in the event they become electric consumers of a SID.

{¶ 10} "22. Residents of the City of Toledo will be unable to determine if the creation of a SID is economically feasible unless it is first resolve [sic] whether they would owe any stranded costs to Toledo Edison, and if so the amount of stranded costs.

{¶ 11} "23. The determination of stranded costs for retail-turned-wholesale customers is vested in the Federal Energy Regulatory Commission (FERC) except the FERC has determined in Order No. 888–B at 62,105 that it will give substantial deference to stranded cost determinations by states in cases of municipalization. (Attached as Exhibit 'C').

{¶ 12} "24. An actual justiciable controversy exists between Toledo and Toledo Edison regarding the existence of stranded costs owed by City of Toledo residents to Toledo Edison in the event that such residents become wholesale customers of Toledo Edison."

{¶ 13} Count Two also seeks a declaratory judgment saying that creation of a SID will not lead to payment of stranded costs because Edison "did not have a reasonable expectation of continued service to customers in the City of Toledo." The city requests, in the alternative, that if Edison is entitled to stranded costs upon creation of a SID, that the court determine "the amount of the stranded costs to be paid by those City of Toledo residents to Toledo Edison." (Complaint, ¶ 25.)

{¶ 14} In its motion to dismiss for lack of jurisdiction, Edison argues that FERC has exclusive or primary jurisdiction to determine wholesale stranded costs; that to the extent FERC allows states to exercise jurisdiction over stranded costs, state commissions rather than state courts have jurisdiction; and that the city has failed to exhaust administrative remedies. The city contends to the contrary that neither FERC's primary nor exclusive jurisdiction operates to

divest a common pleas court of jurisdiction; that stranded costs resulting from creation of a SID do not directly result from FERC's open access rule; and that the Toledo Municipal Code provides for determination of stranded cost issues.

{¶ 15} Thus, the parties' arguments revolve around the definition of stranded costs and who has jurisdiction to hear the issue.

### What are Stranded Costs?

{¶ 16} Before the court can determine whether subject matter jurisdiction exists, "stranded costs" must be defined. The city says that stranded costs represent the revenues lost to a regulated utility when a customer chooses to purchase power from a source other than Edison. It maintains that the amount can be easily determined through application of a formula. Edison, on the other hand, argues that the whole issue of retail-turned-wholesale stranded costs are within FERC's exclusive jurisdiction,[3] an outgrowth of administrative rulemaking, over which a state court has no subject matter jurisdiction.

{¶ 17} For an understanding of the complexity of this issue, it is important to recognize the recent opinion of the United States Court of Appeals for the District of Columbia in *Transm. Access Policy Study Group v. Fed. Energy Regulatory Comm.* (D.C.Cir. 2000), 225 F.3d 667 ("*TAPS v. FERC*").[4] In this detailed and lengthy opinion, the D.C. Circuit reviewed FERC's "open access" rules, i.e., rules to make historically monopolistic utilities more competitive. The very issue of stranded costs is covered in Order 888.[5] One matter *TAPS v. FERC* reviewed was "functional unbundling," which separates utilities' wholesale transmission functions from wholesale power sales functions. The so-called stranded costs were a consequence of this mandate. As the D.C. Circuit Court explained:

■ {¶ 18} "In requiring utilities to provide open access transmission, FERC acknowledged the dramatic change the orders would bring about, explaining that '[t]he most critical transition issue that arises as a result of the Commission's

---

3. The parties agree that the PUCO has jurisdiction over retail stranded costs. The city suggests that a common pleas court has jurisdiction over retail-turned-wholesale costs that would result from a SID.

4. Both sides refer to this opinion. The city is incorrect when it states that Order 888 amply justifies its claim that FERC has merely primary forum jurisdiction rather than exclusive jurisdiction over stranded costs. In *TAPS v. FERC*, the D.C. Circuit reviewed numerous rule challenges made by investor-owned utilities as well as the consumer groups opposing stranded cost recovery. For the most part, FERC was upheld on all of its rulemaking proposals.

5. Order 888, Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed.Reg. 21,646 (1996), was issued by FERC on April 24, 1996.

actions in this rulemaking is how to deal with the uneconomic sunk costs that utilities prudently incurred under an industry regime that rested on a regulatory framework and a set of expectations that are being fundamentally altered.' Order 888–A, ¶ 31,048, at 30,346. Known as 'stranded costs,' these 'uneconomic sunk costs' are costs that utilities incurred not only with regulatory approval but with the expectation of continuing to serve their current customers. These costs will become 'stranded' when customers take advantage of open access transmission to purchase cheaper power from suppliers other than their historic utilities. Order 888 affords utilities an opportunity to recover stranded costs from their wholesale requirements customers but only from those customers who use their utility's transmission service to purchase power from new suppliers, and only if the utility can prove that it had a reasonable expectation of continued service to that customer." *TAPS v. FERC*, 225 F.3d at 683.

{¶ 19} According to FERC, these stranded costs consist predominantly of costs of building generation capacity that utilities incurred with the expectation that they would use the additional capacity to serve existing customers. See Notice of Proposed Rulemaking, Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, FERC Stats. & Regs., ¶ 32,507, at 32,863–32,864, 59 Fed.Reg. 35,274 (1994) ("Stranded Cost NOPR"). Because of increased competition in the power generation market that will result from open access, this capacity may become underutilized or uneconomical, i.e., "stranded." Stranded costs also include nonrecurring costs approved by regulators that, in order to avoid rate increases, were recovered over a period of years instead of at the time the expenditures were made. Known as "regulatory assets," these costs include deferred income taxes, deferred pension and other employee benefit and retirement costs, research and development, extraordinary property losses, and the phase-in of new plant costs. Nuclear decommissioning costs and costs to buy out high-priced fuel and power contracts may also become stranded as a result of open access. See *TAPS v. FERC* at 699.

{¶ 20} The D.C. Circuit explained the reason behind allowing stranded cost recovery in this way:

{¶ 21} "* * * To satisfy expected customer demand, utilities invested money, built facilities, and entered into long-term fuel or power contracts, relying on the 'regulatory compact' under which utility shareholders accepted lower rates of return on their investment in exchange for the certainty of regulated rates and resulting ability to recover prudently incurred costs. * * *"

{¶ 22} Order 888 fundamentally undermined utilities' expectations of continued service and cost recovery. A utility's requirements customers may now use the utility's open access transmission service to purchase power from other suppliers at the end of their contract terms. If customers leave before paying

their share of costs the historic utility incurred on their behalf, the utility will be left with stranded costs, which it will either absorb or shift to remaining customers.

{¶ 23} Unless utilities are able to recover stranded costs, FERC reasoned, their ability to compete and attract investor capital in a deregulated market may be seriously impaired. FERC therefore decided that it had to "address recovery of the transition costs of moving from a monopoly-regulated regime to one in which all sellers can compete on a fair basis and in which electricity is more competitively priced." Order 888, ¶ 31,036, at 31,635. *TAPS v. FERC*, 225 F.3d at 700.

{¶ 24} However, stranded costs are not to be recovered automatically. The FERC rule allows utilities to recover their stranded costs only if a reasonable expectation of continued service can be demonstrated and if customers actually take advantage of their former utility's open access transmission lines to reach cheaper sources of power.[6] The commission is expected to make that determination. As the D.C. Circuit court noted:

{¶ 25} "To recover stranded costs, a utility must demonstrate its continued expectation of service at an evidentiary hearing. The customer may appear at that hearing and, through evidentiary submissions of its own, attempt to demonstrate that the utility had no such expectation. Only after such a hearing may FERC decide whether a utility can recover stranded costs and, if so, how much." *TAPS v. FERC*, 225 F.3d at 701.

{¶ 26} As to how the costs will be calculated, under Order 888, a departing customer's stranded cost obligation equals the estimated revenue it would have paid had it continued to purchase power from the historic utility minus the current market value of the power it would have purchased, calculated over the period the utility is determined to have a reasonable expectation of continued service to that customer. See Section 35.26(c)(2)(iii), Title 18, C.F.R. In other words, the stranded cost formula is not tied to particular stranded assets or contractual commitments but rather awards utilities the difference between the pre-open access cost-based rate and the post-open access market rate. Once a customer's stranded cost liability is calculated, it may pay through a lump-sum payment, installment payments, or a surcharge to the transmission rate charged

---

6. The city contends that Edison cannot rely upon the "reasonable expectation of continued service" because under its NRC license, it was required to provide access to its transmission lines before FERC mandated open access. FERC, however, has ruled in a contrary manner in *Duquesne Light Co.* (1997), 79 FERC ¶ 61,116, 1997 WL 217640, and *Duke Power Co.* (1997), 79 FERC ¶ 61,161, 1997 WL 252098 (mere existence of NRC license did not prevent utilities from claiming they had reasonable expectations of continuing to serve).

by the historic utility. See Order 888, ¶ 31,036, at 31,799. *TAPS v. FERC* at 701.

{¶ 27} In summary, a review of *TAPS v. FERC* on the matter of stranded costs demonstrates that it is a question of complex ratemaking rather than a simple decision reached by simple formula.[7] It is the type of decision that belongs to administrative experts. The next question, then, is who has the jurisdiction to decide.

### Who Has Jurisdiction Over Stranded Costs?

{¶ 28} The city maintains that the PUCO has jurisdiction over retail stranded costs but does not agree that FERC has *exclusive* jurisdiction over wholesale stranded costs. In a portion of its brief, the city quoted a section from *TAPS v. FERC*, 225 F.3d at 718, to suggest that a state court had jurisdiction; however, it misreads the language:

{¶ 29} "As an initial matter, we agree with FERC that petitioners confuse costs and rates. Rates are jurisdictional; costs are not. As Order 888–A explains:

{¶ 30} " '[T]here are rarely separate retail and wholesale generating facilities. Retail customers and wholesale requirements customers get energy from the same facilities, each buying a "slice of the system." Typically all generating assets go into both the retail and the wholesale rate bases for determining retail and wholesale rates. Rates are determined by allocating the total generating costs among customer classes. The parties confuse the issue before us to the extent they suggest that state commissions, not this Commission, have "jurisdiction" over certain "costs." Neither the state commissions nor this Commission has exclusive jurisdiction over "costs." Each regulatory authority has jurisdiction to determine "rates" for services subject to its jurisdiction and, in determining rates, may take into account all of the costs incurred by the utility.' " Order 888–A, ¶ 31,048, at 30,414.

{¶ 31} The D.C. Circuit agreed that FERC shares jurisdiction over stranded costs—but with states' regulatory commissions, not with the state courts. Contrary to the city's claims, nowhere is there language to suggest that a state court has jurisdiction to hear these matters. The unquoted part of the same paragraph continues and clarifies:

{¶ 32} "In other words, as FERC explained in its brief, 'regulatory authorities do not carve out so-called "wholesale costs" that only FERC can take into

---

7. The city suggests that the court need determine only three amounts: (1) a revenue stream estimate, (2) a competitive market value estimate, and (3) the length of the obligation. This, however, sounds suspiciously like ratemaking.

account in determining rates subject to its jurisdiction or so-called "retail costs" that only a state commission can take into account in determining rates subject to state jurisdiction.' Instead, '[u]nder historical cost-of-service ratemaking, each regulatory authority, in exercising its respective *ratemaking* jurisdiction, reviews the *total* costs incurred by a utility to provide service and makes its separate and independent determination of what costs may be recovered through rates within its jurisdiction.' " (Emphasis added in part.) Order 888–A, ¶ 31,048, at 30,414. *TAPS v. FERC* at 718.

{¶ 33} In disagreeing with the claim that FERC unduly interfered with the authority states have over retail stranded cost recovery claims, the D.C. Circuit stated:

{¶ 34} "* * * FERC has limited its 'interference' to instances where state commissions have no authority even to *address* stranded cost recovery claims. Describing its role as limited to 'fill[ing] any regulatory gap,' FERC made it clear that it will deny consideration to any utility seeking stranded cost recovery 'if a state regulatory authority with authority to address retail wheeling stranded costs has in fact addressed such costs, regardless of whether the state regulatory authority has allowed full recovery, partial recovery, or no recovery.' Order 888–A, ¶ 31,048, at 30,415. Under these circumstances, it can hardly be said that FERC has usurped state authority." (Emphasis added in part.) *TAPS v. FERC*, 225 F.3d at 719.

{¶ 35} The D.C. circuit also remarked:

{¶ 36} "Only in situations where state regulatory commissions lack authority to award stranded costs will FERC include these costs in transmission rates. Otherwise, customers would be able to avoid their stranded cost obligations, leaving utility shareholders or remaining customers to bear the costs." *TAPS v. FERC*, 225 F.3d at 721.

{¶ 37} In Ohio, the PUCO has been given broad authority. The Supreme Court of Ohio stated in *State ex rel. N. Ohio Tel. Co. v. Winter* (1970), 23 Ohio St.2d 6, 52 O.O.2d 29, 260 N.E.2d 827:

{¶ 38} "The General Assembly has enacted an entire chapter of the Revised Code dealing with public utilities, requiring, inter alia, adequate service, and providing for permissible rates and review procedure. E.g., R.C. 4905.04, 4905.06, 4905.22, 4905.231 and 4905.381. Further, R.C. 4905.26 provides a detailed procedure for filing service complaints. This comprehensive scheme expresses the intention of the General Assembly that such powers were to be vested solely in the commission." Id. at 9, 52 O.O.2d 29, 260 N.E.2d 827.

{¶ 39} The parties do agree that the PUCO has jurisdiction over retail stranded costs. The city, however, suggests that a common pleas court has

concurrent jurisdiction over what they allege would be retail-turned-wholesale costs resulting from a SID. With respect to retail-turned-wholesale customers, the D.C. Circuit discusses the idea in part VB2 of *TAPS v. FERC* and recognizes that for "municipalizations" FERC would be the first, or "primary" forum[8]:

{¶ 40} "* * * In such cases, FERC will determine on a case-by-case basis whether there exists the requisite nexus between municipal annexation and open access transmission. Recognizing that state regulatory authorities may be the first to address claims for stranded cost recovery in the retail-turned-wholesale scenario (FERC's label for new municipalizations and municipal annexations), FERC stated that it "will take into account state findings on cost determinations * * * and will give great weight in [its] proceedings to a state's view of what might be recoverable." " Id. at 62,105 (internal quotation marks omitted). *TAPS v. FERC* at 722.

{¶ 41} Other newly formed municipal electric systems have acknowledged FERC's authority. At least three separate applications have been accepted by the agency. See *Las Cruces* (1999), 87 FERC ¶ 61,201, 1999 WL 333883; *Alma, Michigan* (1999), 88 FERC ¶ 63,002, 1999 WL 504863; and *Lakewood, New York* (1998), 85 FERC ¶ 61,339, 1998 WL 858250. In each case, FERC has taken jurisdiction.

{¶ 42} The D.C. Circuit further explained how state regulatory agencies and FERC may have concurrent jurisdiction:

{¶ 43} " '[W]here such costs are stranded as a direct result of Commission-mandated wholesale transmission access, these costs should be viewed as costs of the transition to competitive wholesale bulk power markets and this Commission should be the primary forum for addressing their recovery.' Order 888–A, ¶ 31,048, at 30,407. In our view, this explanation adequately distinguishes between recovery of stranded costs from retail customers and recovery from retail-turned-wholesale customers. In the former situation customers remain retail customers subject to state jurisdiction; in the latter situation, customers become wholesale customers subject to FERC's *exclusive* jurisdiction. This very different result justifies FERC's different treatment of the two situations." (Emphasis sic.) *TAPS v. FERC*, 225 F.3d at 724.

{¶ 44} The city suggests that if this court were to decide the stranded cost question, Edison would then simply apply to FERC to have the amount included in the transmission rates charged to the city. Yet it is clear that deciding whether stranded cost recovery is permitted is an administrative not a common pleas court function.

---

8. The city's distinctions between FERC's primary or exclusive jurisdictions are not relevant; the important point is that a state court cannot determine stranded costs.

{¶ 45} It is true that the court of common pleas has concurrent jurisdiction to hear certain cases sounding in tort and contract involving public utilities. See, e.g., *Kohli v. Pub. Util. Comm.* (1985), 18 Ohio St.3d 12, 18 OBR 10, 479 N.E.2d 840 (court had jurisdiction over tort claim for failure to warn of dangers); *McComb v. Suburban Natural Gas Co.* (1993), 85 Ohio App.3d 397, 619 N.E.2d 1109 (court had jurisdiction over breach-of-contract claim in lease dispute between gas company and village); *Milligan v. Ohio Bell Tel. Co.* (1978), 56 Ohio St.2d 191, 10 O.O.3d 352, 383 N.E.2d 575 (court had jurisdiction over invasion of privacy claim but not over claim of wrongful termination of service). But, see, *Gallo Displays, Inc. v. Cleveland Pub. Power* (1992), 84 Ohio App.3d 688, 618 N.E.2d 190 (court had no jurisdiction over common-law nuisance claim against utility); *State ex rel. N. Ohio Tel. Co. v. Winter* (1970), 23 Ohio St.2d 6, 52 O.O.2d 29, 260 N.E.2d 827 (court had no jurisdiction over discontinuation of telephone service for nonpayment).

{¶ 46} If there was any doubt over whether this court has subject matter jurisdiction, it would be resolved by *State ex rel. Cleveland Elec. Illum. Co. v. Cuyahoga Cty. Court of Common Pleas* (2000), 88 Ohio St.3d 447, 727 N.E.2d 900. In that case, the extraordinary writ of prohibition was granted against a common pleas judge because she had no authority to hear a case involving a public utility's rates and charges. The court quoted from *Kazmaier Supermarket, Inc. v. Toledo Edison Co.* (1991), 61 Ohio St.3d 147, 151, 573 N.E.2d 655:

{¶ 47} "There is perhaps no field of business subject to greater statutory and governmental control than that of the public utility. This is particularly true of the rates of a public utility. Such rates are set and regulated by a general statutory plan in which the Public Utilities Commission is vested with the authority to determine rates in the first instance, and in which the authority to review such rates is vested exclusively in the Supreme Court by Section 4903.12, Revised Code * * *."

{¶ 48} Since the determination of stranded costs is one that is similar to the decisions relating to ratemaking, this is not similar to *Cleveland v. Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1, 684 N.E.2d 343, the case on which the city relies. In that case, injunctive relief was sought by the city of Cleveland because the electric company refused to guarantee a power minimum. The city had cast its complaint as a contract issue.

{¶ 49} Finally, the city suggests that the Toledo Municipal Code gives the court jurisdiction. It alleges that on September 29, 1998, Ordinance 1038–98 created Chapter 947 of the Toledo Municipal Code, "Provisions of Electric Energy," and that sections 947.11 (municipal acquisition) and 947.12 (wholesale power transmissions) show intent to allow a common pleas court to hear all matters resulting from regulation of the transmission of electricity. The issue of

stranded costs is mentioned in Section 947.11 relating to eminent domain, which states:

{¶ 50} "The City reserves the right to acquire all or any part of the Utility Facilities located within the City of Toledo which are owned by a Provider free and clear of all mortgage and other liens, in accordance with the eminent domain laws of the State of Ohio and the Constitution and laws of the United States. Nothing contained in this chapter shall prevent the Provider from asserting, or the City from opposing, that just compensation, determined as part of an eminent domain proceeding, for the Provider should include recovery by the Provider of stranded costs and/or competitive transition charges associated with the transition of the electric utility industry in Ohio to a more competitive environment, to the extent permitted by state or federal law on the Utility Facilities sought by the City. However, any such request for such stranded costs/competitive transition charges as part of just compensation in an eminent domain proceeding shall be associated with the actual generation, transmission, or distribution facilities sought by the City as part of said eminent domain proceeding and shall not include any stranded costs/competitive transition charges associated with the real property on which such generation, transmission or distribution facilities sought by the City are located."

{¶ 51} According to the city, because eminent domain proceedings are brought in common pleas court, stranded costs are also a matter for this court to determine. This is a stretch in interpretation, for the appropriation power of a municipal corporation certainly cannot override federal energy policy. Furthermore, even if the parties were to stipulate that the idea of stranded costs were a contract issue, this court could not act, since subject matter jurisdiction cannot be altered by the agreement of the parties. *State ex rel. Jones v. Suster* (1998), 84 Ohio St.3d 70, 701 N.E.2d 1002.

{¶ 52} To summarize, the declaratory judgment request in Count Two, although characterized by the city as a simple contract interpretation, is one that requires administrative expertise. As *TAPS v. FERC* explains, the issue arises as a result of federal policy. For retail-turned-wholesale customers the questions will be handled in the first instance by FERC, otherwise they will be answered by the PUCO. The purpose of providing an administrative agency such as the PUCO with such jurisdiction is that the resolution of such claims is best accomplished by the commission with its expert staff technicians familiar with the utility commission provisions. *Gayheart v. Dayton Power & Light Co.* (1994), 98 Ohio App.3d 220, 648 N.E.2d 72. That administrative jurisdiction is exclusive and reviewable only by the Supreme Court. *State ex rel. N. Ohio Tel. Co. v. Winter* (1970), 23 Ohio St.2d 6, 52 O.O.2d 29, 260 N.E.2d 827. This court,

finding that the dispute set forth in Count Two is about rates or technical matters, has no subject matter jurisdiction over stranded costs.

## JOURNAL ENTRY

{¶ 53}   It is ORDERED that the motion of defendant, the Toledo Edison Company, to dismiss Count Two of the city of Toledo's complaint for lack of subject matter jurisdiction is GRANTED.   Count Two is DISMISSED, with prejudice to refiling.

{¶ 54}   This case is continued on Count One.

*Judgment accordingly.*