[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Columbus S. Power Co.,* Slip Opinion No. 2016-Ohio-1608.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1608

IN RE APPLICATION OF COLUMBUS SOUTHERN POWER COMPANY AND OHIO POWER COMPANY FOR AUTHORITY TO ESTABLISH A STANDARD SERVICE OFFER UNDER R.C. 4928.143 IN THE FORM OF AN ELECTRIC SECURITY PLAN; THE KROGER COMPANY ET AL., APPELLANTS AND CROSS-APPELLEES; OHIO POWER COMPANY, D.B.A. AEP OHIO, APPELLEE AND CROSS-APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE AND CROSS-APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Columbus S. Power Co.,* Slip Opinion No. 2016-Ohio-1608.]

*Public utilities—Electric-security plan—Commission's orders approving modified electric-security plan—Retail stability rider—R.C. 4928.143(B)(2)(d)—Commission erred in approving RSR—RSR allows collection of unlawful transition revenue—Orders reversed in part and cause remanded.*

(No. 2013-0521—Submitted May 19, 2015—Decided April 21, 2016.)

APPEAL and CROSS-APPEAL from the Public Utilities Commission, Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM.

_____

**KENNEDY, J.**

## SUMMARY

**{¶ 1}** This cause arises from the Public Utilities Commission's modification and approval of the second electric-security plan of the American Electric Power operating companies, Ohio Power Company and Columbus Southern Power Company.[1] The case below was a major proceeding in which the commission authorized new generation rates for the companies (collectively, "AEP"). Five parties appealed.[2] AEP also filed a cross-appeal. In total, the remaining parties have raised eight propositions of law that challenge various elements of the commission's orders (the original order and two entries on rehearing) approving the modified electric-security plan.

**{¶ 2}** After review, we conclude that the parties have demonstrated two errors: one on appeal and one on cross-appeal. Therefore, for the reasons that follow, we affirm the commission's orders in part and reverse them in part and remand the cause for further consideration.

## FACTS AND PROCEDURAL BACKGROUND

**{¶ 3}** R.C. 4928.141(A) requires electric-distribution utilities to make a "standard service offer" of generation service to consumers in one of two ways:

---

[1] According to a document filed with the Securities and Exchange Commission on January 6, 2012, Columbus Southern Power Company and Ohio Power Company merged on December 31, 2011, with Ohio Power Company as the surviving entity. *See* https://www.aep.com/investors/financialfilingsandreports/filings/HTMLView.aspx?ipage=7988106. The merger was approved by the Ohio Public Utilities Commission in *In re Application of Ohio Power Co. for Auth. to Merge,* Pub. Util. Comm. No. 10-2376-EL-UNC, *56-57 (Dec. 14, 2011).

[2] FirstEnergy Solutions and Industrial Energy Users-Ohio dismissed their appeals, leaving three appellants. *See* 139 Ohio St.3d 1475, 2014-Ohio-3028, 11 N.E.3d 1196; 144 Ohio St.3d 1436, 2015-Ohio-5451, 42 N.E.3d 770.

through a "market-rate offer" (under R.C. 4928.142) or an "electric security plan" (under R.C. 4928.143). The market-rate offer, as the name implies, sets rates using a competitive-bidding process to harness market forces.

{¶ 4} On January 27, 2011, AEP filed an application with the commission, seeking approval of an electric-security plan ("ESP"). R.C. 4928.143 does not provide a detailed mechanism for establishing rates under an ESP. Plans may contain any number of provisions in a variety of categories so long as the plan is "more favorable in the aggregate" than the expected results of a market-rate offer. R.C. 4928.143(C)(1). But the law does contain certain limits, some of which are at issue in this case.

### The Commission's "Capacity Case" Order

{¶ 5} The ESP case proceeded along a parallel—and for a time a consolidated—path with Pub. Util. Comm. No. 10-2929-EL-UNC (the "Capacity Case"). The Capacity Case was argued before the court on December 15, 2015 (case Nos. 2012-2098 and 2011-0228). On December 30, 2015, the court issued an order holding this case for a joint release with the Capacity Case. *See* 144 Ohio St.3d 1438, 2015-Ohio-5468, 43 N.E.3d 450.

### The Commission's ESP Order

{¶ 6} In the order under review in this appeal, the commission approved AEP's modified ESP. Pub. Util. Comm. Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM (Aug. 8, 2012) (the "ESP Order"). As part of the ESP, the commission approved a mechanism called the "Retail Stability Rider" ("RSR"). The RSR is "nonbypassable," meaning that it is paid by both shopping and nonshopping customers in AEP's service territory.

{¶ 7} The RSR serves two purposes. First, the commission determined that the RSR would be used as the mechanism for AEP to recover its deferred capacity costs from the Capacity Case. The commission authorized AEP to recover a portion of those deferred costs during the ESP period. The commission

further instructed AEP to file an application after the ESP ends that, if approved, would allow the company to recover any remaining deferred capacity costs, starting on June 1, 2015, and continuing over the following 32 months.

**{¶ 8}** Second, in addition to serving as the mechanism to recover deferred capacity costs, the RSR was intended to provide AEP with sufficient revenue to maintain its financial integrity and ability to attract capital during the ESP. According to the commission, the RSR was authorized under R.C. 4928.143(B)(2)(d) as a charge that promotes stable retail-electric-service prices and ensures customer certainty regarding retail electric service. ESP Order at 31-38.

**{¶ 9}** Appeals of the ESP Order were filed by the Kroger Company, the Office of the Ohio Consumers' Counsel ("OCC"), and the Ohio Energy Group. AEP filed a cross-appeal. The appellants primarily challenge the commission's authorization of the RSR. In AEP's cross-appeal, the company contends that the commission erred in setting the threshold for the significantly-excessive-earnings test and also violated the company's statutory right to withdraw the modified ESP.

## STANDARD OF REVIEW

**{¶ 10}** "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The

appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id*.

{¶ 11} Although this court has "complete and independent power of review as to all questions of law" in appeals from the commission, *Ohio Edison Co. v. Pub. Util. Comm*., 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm*., 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

DISCUSSION

**The Appeals of Appellants: OCC, Kroger, and Ohio Energy Group**

{¶ 12} The appellants, taken together, raise five propositions of law, each containing several supporting arguments. The issues involving the RSR are the most prominent and generally relate to each other, so we will discuss them first.

**I.        Challenges to the commission's approval of the RSR**

{¶ 13} The appellants raise several challenges to the commission's approval of the RSR. After review, we find that one argument has merit.

**A.        *OCC Proposition of Law No. 2*: Whether the commission's order is unlawful or unreasonable because it allows the company to collect unlawful transition revenue or its equivalent through the RSR**

{¶ 14} OCC argues that the commission erred in approving the RSR because it permits AEP to recover unlawful "transition revenues" in the form of nonfuel generation revenues, including capacity revenues, that it will lose under its ESP. OCC claims that because the statutory time period to recover transition revenue has ended, the commission lacked authority to approve the RSR, since it

allowed the company to recover costs that are otherwise unrecoverable in the competitive generation market. We find this argument well taken.

1.        **What is transition revenue, and when was its recovery barred?**

{¶ 15} Transition costs (also referred to as stranded costs) are costs incurred by the utility before retail competition began that will not be recoverable through market-based rates. *See FirstEnergy Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 401, 2002-Ohio-2430, 768 N.E.2d 648, ¶ 14; R.C. 4928.37 and 4928.39. In general, these are generation costs that the utility incurred to serve its customers that would have been recovered through regulated rates before competition began, but that are no longer recoverable from customers who have switched to another generation provider. *See Toledo v. Toledo Edison Co.*, 118 Ohio Misc.2d 131, 2000-Ohio-2696, 770 N.E.2d 132, ¶ 18-19, citing *Transm. Access Policy Study Group v. Fed. Energy Regulatory Comm.*, 225 F.3d 667, 683, 699-700 (D.C.Cir.2000). When such customers leave the utility's generation service, they may not have paid their share of costs that the utility incurred on their behalf. The idea behind transition revenue is to allow the utility to avoid having to either absorb these costs or shift the burden of recovery onto remaining customers. *Id.* at ¶ 22.

{¶ 16} In 1999, the General Assembly enacted Am.Sub.S.B. No. 3 ("S.B. 3"), 148 Ohio Laws, Part IV, 7962, "to facilitate and encourage development of competition in the retail electric market." *AK Steel Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 81, 765 N.E.2d 862 (2002). Enacted as part of S.B. 3, R.C. 4928.37 provided each electric utility with a limited opportunity "to receive transition revenues that may assist it in making the transition to a fully competitive retail electric generation market." Utilities had until December 31, 2005 (the end of the market-development period, *see* R.C. 4928.01(A)(26)) to receive generation transition revenue. R.C. 4928.38 and 4928.40(A). Utilities were also permitted to receive transition revenue associated with regulatory assets (i.e., deferred charges,

*see* R.C. 4928.01(A)(26)) until December 31, 2010. R.C. 4928.40(A). After that date, R.C. 4928.38 prohibits the commission from "authoriz[ing] the receipt of transition revenues or any equivalent revenues by an electric utility," with certain exceptions not applicable here.

{¶ 17} R.C. 4928.141(A), enacted as part of Am.Sub.S.B. No. 221, expressly prohibits the recovery of transition costs by providing that a standard service offer made through an ESP "shall exclude any previously authorized allowances for transition costs, with such exclusion being effective on and after the date that the allowance is scheduled to end under the utility's rate plan."

2.     **The commission's order on the subject of transition costs is unlawful and unreasonable**

{¶ 18} As noted, R.C. 4928.38 bars the commission from authorizing the "receipt of transition revenues or any equivalent revenues" after December 31, 2010. OCC maintains that the commission violated this provision when it guaranteed that AEP will receive $826 million in nonfuel generation revenues through the RSR in each year of the ESP. OCC argues that the RSR cannot be upheld because it allows the company to receive transition revenue or "equivalent" revenues that are no longer authorized in the competitive generation market after the deadlines in R.C. 4928.38 and 4928.40.

{¶ 19} In the orders below, the commission found that AEP was not receiving unlawful transition revenue through the RSR. The commission offered two reasons to support its finding. After review, we find that neither one is well taken.

a.     **The fact that AEP did not expressly seek transition revenues in this case does not defeat a claim that it is recovering transition revenues**

{¶ 20} The commission first found that AEP was not receiving unlawful transition revenue because the company did not seek transition revenues in its modified ESP application. ESP Order at 32; First Rehearing Entry at 21 (Jan. 30,

2013). According to the commission, AEP is not receiving transition revenues or recovering stranded costs through the RSR, since AEP did not argue that the revenues received under its prior electric-transition plan were insufficient to cover costs. ESP Order at 32.

{¶ 21} But the fact that AEP did not explicitly seek transition revenues does not foreclose a finding that the company is receiving the equivalent of transition revenue under the guise of the RSR. The commission's overly narrow definition of transition revenue overlooks that R.C. 4928.38 bars "the receipt of transition revenues *or any equivalent revenues* by an electric utility" after 2010. (Emphasis added.) By inserting the phrase "any equivalent revenues," the General Assembly has demonstrated its intention to bar not only transition revenue associated with costs that were stranded during the transition to market following S.B. 3 but also any revenue that amounts to transition revenue by another name. Therefore, we find that the commission erred in focusing solely on whether AEP had sought to receive transition revenues that are now barred.

{¶ 22} Further, after looking at the nature of the revenue recovered under the RSR, we find that the record supports a finding that AEP is receiving the equivalent of transition revenues through that rider. As noted above, S.B. 3 allowed electric utilities to receive transition revenues to aid them in making the transition to a fully competitive generation market. R.C. 4928.37(A)(1). *See FirstEnergy Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 401, 2002-Ohio-2430, 768 N.E.2d 648, ¶ 14 (transition revenues represent regulatory assets and other generation costs that were incurred by the utility under regulation that would not be recovered in a competitive environment); *Toledo v. Toledo Edison Co.*, 118 Ohio Misc.2d 131, 2000-Ohio-2696, 770 N.E.2d 132, ¶ 19 (C.P.) ("stranded costs consist predominately of costs of building generation capacity that utilities incurred with the expectation that they would use the additional capacity to serve existing customers").

**{¶ 23}** AEP proposed the RSR as a means to ensure that the company was not financially harmed during its transition to a fully competitive generation market over the three-year ESP period. To be more specific, the RSR was intended to guarantee recovery of lost revenue resulting from certain discounted capacity prices offered to CRES providers and from expected increases in customer shopping during the ESP. According to the company's witnesses, the RSR was designed to generate enough revenue for the company to achieve a certain rate of return on its generation assets as it transitions to full auction pricing for energy and capacity by June 2015. ESP Order at 31-32.

**{¶ 24}** In determining how much revenue would be needed to reach the $826 million revenue target for each year, the commission focused on three categories of revenue: retail nonfuel generation revenues, CRES capacity revenues, and credit for shopped load. In calculating these revenue amounts, the commission relied on shopping projections for AEP's service territory during the three-year ESP period. That is, the shopping projections would determine a combined amount of revenue that AEP would earn for each category listed above, and the RSR would be set at the amount necessary to boost the total to the revenue target of $826 million. Importantly, the commission's calculations show that RSR revenues were tied in large part to CRES capacity revenues that AEP would expect to lose based on the projected shopping and the below-cost price of capacity charged to CRES providers during the ESP period. ESP Order at 34-35.

**{¶ 25}** In sum, we find that the commission erred in focusing solely on whether AEP had expressly sought to receive transition revenues rather than looking at the nature of the costs recovered through the RSR. R.C. 4928.38 bars the "the receipt of transition revenues *or any equivalent revenues* by an electric utility." Based on the record before us, we find that the RSR in this case recovers the equivalent of transition revenue and the commission erred when it found otherwise.

**b.** **The commission erred when it found that anything above PJM auction capacity prices cannot be labeled as transition costs or stranded costs**

{¶ 26} The commission found that the revenues recovered through the RSR were lawful because AEP was entitled to recover its "actual costs of capacity." AEP's capacity charge is higher than the auction price of capacity in the PJM region. According to the commission, because AEP is the sole provider of capacity service in its territory, "anything over" PJM auction capacity prices "cannot be labeled as transition costs or stranded costs." ESP Order at 32. We disagree.

**1.** **The commission's rejection of AEP's two-tiered capacity-pricing mechanism and its determination of an appropriate capacity charge**

{¶ 27} At the outset, it is important to understand that AEP had proposed two separate capacity-pricing plans to the commission: one in the Capacity Case and a completely different plan in the ESP Case. The following background is therefore provided to place this issue in proper context.

{¶ 28} Before the commission issued its order in the ESP Case, the commission found in the Capacity Case that AEP was allowed to recover its actual costs to provide capacity to CRES providers. Pub. Util. Comm. No. 10-2929-EL-UNC, at 33 (July 12, 2012). In the Capacity Case, AEP had claimed that a capacity charge of $355.72 per megawatt-day would enable it to fully recover its costs and earn a reasonable return on its investments. *Id*. at 24. The commission rejected that assertion, finding instead that a charge of $188.88 per megawatt-day was sufficient to fairly compensate the company for providing capacity. *Id*. at 33.

{¶ 29} The commission, however, was concerned that AEP's cost-based capacity charge would have a negative impact on retail competition in the company's service territory. As a result, the commission ordered AEP to charge

10

CRES providers at the PJM auction price during the ESP period, a discount from the commission-ordered cost-based capacity charge of $188.88 per megawatt-day. The commission further ordered in the Capacity Case that AEP defer its recovery of the difference between the discounted capacity charge and the cost-based capacity charge until after the ESP ends. *Id*. at 33-35, 23.

{¶ 30} While the Capacity Case was still pending before the commission, AEP offered a capacity-pricing plan in the ESP Case that was different from the company's litigated position in the Capacity Case. In its modified ESP application, the company proposed to sell capacity to CRES providers at a discount from the $355.72 per megawatt-day price, which is the rate that AEP claimed represented its costs to provide capacity. Under this proposal, AEP would provide capacity to CRES providers under a two-tiered pricing plan, with the tier-one rate set at $145.79 per megawatt-day and the tier-two rate at $255 per megawatt-day. As part of this two-tiered pricing plan, AEP asked the commission to approve the RSR as the mechanism that would enable the company to recover the difference between the discounted capacity sold to CRES providers under the two tiers and what it claimed was its fully embedded costs of capacity (the $355.72 per megawatt-day rate). ESP Order at 50.

{¶ 31} After the commission rejected AEP's capacity charge of $355.72 per megawatt-day in the Capacity Case, it issued the order in the ESP Case. Having found that a capacity charge of $188.88 per megawatt-day would enable AEP to fully recover its capacity costs, the commission rejected the two-tiered pricing mechanism that AEP had proposed in its modified ESP application. The commission, however, approved the RSR in the ESP Case, even though it had been proposed as a component of the now-rejected two-tiered capacity plan. As noted above, with the approval of the RSR, AEP was able to recover an additional $508 million in revenue during the ESP period. *See* ESP Order at 31-32, 35-36.

**2.    The commission has allowed AEP to recover more than its actual capacity costs through the nondeferral portion of the RSR**

{¶ 32} We do not agree with the commission's finding that "anything over" PJM auction capacity prices "cannot be labeled as transition costs or stranded costs." According to the commission, AEP is not receiving unlawful transition revenue through the RSR because AEP is entitled to recover its actual capacity costs based on its status as the sole provider of capacity in its service territory. ESP Order at 21. But the commission ignores that it has allowed AEP to recover *more* than its actual capacity costs through the nondeferral part of the RSR.

{¶ 33} As we note in the preceding section, AEP will recover its actual capacity costs (based on a charge of $188.88 per megawatt-day). AEP will recover its costs in the following manner: (1) charging CRES providers during the ESP period at the PJM auction price (a discount from AEP's cost-based capacity charge of $188.88 per megawatt-day), (2) deferring for later recovery the difference between the discounted charge and AEP's cost-based capacity charge, (3) collecting a portion of the deferred capacity costs during the ESP through the RSR, and (4) collecting any remaining balance of the deferred costs (plus carrying charges) after the ESP period ends. Capacity Case Order at 33-35, 23; ESP Order at 31-38.

{¶ 34} Yet despite the fact that the commission authorized AEP to recover its actual capacity costs, the commission also allowed AEP to recover $508 million in additional revenue through the RSR during the ESP period, the amount of which appears to be tied in large part to AEP's recovery of CRES capacity charges. ESP Order at 34-35. Again, the commission calculated the RSR amount in part based on expected decreases in CRES capacity revenues during the ESP due to (1) the projected level of shopping in AEP's territory and (2) the discounted capacity price (well below AEP's costs) charged to CRES providers.

12

Thus, the commission awarded AEP additional capacity revenues through the nondeferral portion of the RSR, even though it had found that AEP would fully recover its incurred CRES capacity costs at a rate of $188.88 per megawatt-day. Accordingly, we find that the company is being overcompensated for providing capacity service through the nondeferral part of the RSR.

{¶ 35} Although the commission cited various reasons for approving the RSR, none justifies the additional capacity revenue recovery associated with the RSR. The commission first implied that the RSR was necessary to "ensure [that] AEP-Ohio has sufficient funds to maintain its operations efficiently and revise its corporate structure, as opposed to a deferral only mechanism." ESP Order at 36-37. But the commission found in the Capacity Case that "a capacity charge of $188.88/MW-day, in conjunction with the authorized deferral of the Company's incurred capacity costs," would "reasonably and fairly compensate the Company and should not significantly undermine the Company's ability to earn an adequate return on its investment." 10-2929-EL-UNC, at 36. The ESP Order was issued five weeks after the commission made this finding in the Capacity Case. Yet the commission fails to explain in the ESP Order why, only five weeks later, the cost-based capacity charge and "deferral only mechanism" authorized in the Capacity Case were no longer adequate.

{¶ 36} Second, according to the commission, "no party disputes that the approval of the RSR will provide AEP-Ohio with sufficient revenue to ensure it maintains its financial integrity as well as its ability to attract capital." ESP Order at 31. While no party may have disputed that this was the intended purpose of the RSR, several parties challenged whether the RSR was necessary to achieve that purpose. To be sure, after the commission had determined an appropriate cost-based capacity charge for AEP in the Capacity Case, several parties argued in the ESP Case that the additional revenue generated from the proposed RSR was no longer necessary.

{¶ 37} Beyond the lack of reasoning, we have carefully reviewed the ESP Order and find that it contains no evidence that would support approval of the additional capacity revenue recovered through the RSR under the circumstances presented in this case. *See In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 24-25 (lack of record support for portion of order justifies reversal). The critical problem is that the evidence relied on by the commission to approve the RSR was evidence that AEP had submitted to support the RSR under the two-tiered capacity-pricing plan. But the foundation for the RSR was eliminated when the commission rejected the two-tiered plan and found instead that AEP would be fully compensated for providing capacity under the cost-based charge approved in the Capacity Case. And no evidence was submitted in the ESP Case after the commission issued its decision in the Capacity Case. In short, none of the evidence cited in the ESP Order is relevant to whether it was necessary for AEP to recover additional revenue through the RSR beyond the costs that the company incurred to provide capacity service.

### 3. Conclusion as to transition-revenue issue

{¶ 38} Based on the foregoing, we find that the commission erred when it found that AEP was not recovering transition revenue or its equivalent through the RSR.[3] The commission's finding that the RSR does not recover unlawful

---

[3] R.C. 4928.143(B) provides:

"Notwithstanding any other provision of Title XLIX of the Revised Code to the contrary except division (D) of this section, divisions (I), (J), and (K) of section 4928.20, division (E) of section 4928.64, and section 4928.69 of the Revised Code:
* * *
(2) The [electric security] plan may provide for or include, without limitation, any of the following [listing nine categories of permissible terms]." The "[n]otwithstanding" provision can be read as creating an exception to the prohibition against transition revenue. But because the commission did not rely on this language in the case below, and no party appears to have raised the issue, we decline to consider it on appeal.

transition revenue lacks sound reasoning and record support. Therefore, it cannot be upheld.

{¶ 39} As to the question of remedy, we note that AEP is currently collecting the deferred capacity costs with carrying charges through the RSR. *In re Application of Ohio Power Co. to Adopt a Final Implementation Plan for the Retail Stability Rider,* Pub. Util. Comm. No. 14-1186-EL-RDR, at 11-12 (Apr. 2, 2015). In addition, in the Capacity Case appeals, we affirmed the commission's decision that AEP is entitled to charge a cost-based state compensation mechanism and that the $188.88 per megawatt-day rate is reasonable.

{¶ 40} Because AEP is entitled to recover only its actual capacity costs, we order the commission to adjust the balance of its deferred capacity costs to eliminate the overcompensation of capacity revenue recovered through the nondeferral part of the RSR during the ESP. However, because of the method employed by the commission to calculate the RSR, we are unable to determine exactly how much of the revenue recovered through the nondeferral part of the RSR is allocable to CRES capacity revenues. We therefore remand this matter to the commission to determine that amount and offset the balance of deferred capacity costs by the amount determined.

**B.      *Ohio Energy Group Proposition of Law No. 1*: Whether the commission erred in incorporating deferred capacity costs in the RSR and deferring those costs under R.C. 4928.144**

{¶ 41} Ohio Energy Group next argues that the commission's order violated R.C. 4928.144 by deferring capacity costs that were approved in the Capacity Case and not as part of the ESP. R.C. 4928.144 provides that the commission "may authorize any just and reasonable phase-in of any electric distribution utility rate or price established under sections 4928.141 to 4928.143 of the Revised Code." According to Ohio Energy Group, because the capacity charges were not established under R.C. Chapter 4928, the commission erred

when it deferred those costs through the RSR for later recovery. We find that this argument lacks merit.

{¶ 42} Ohio Energy Group challenges only the $144 million in revenue that was collected through the RSR to pay down the balance of the deferred capacity costs. But these costs were not deferred; they were collected during the ESP. Therefore, Ohio Energy Group's challenge under R.C. 4928.144 in this context is misplaced.

**C.     Challenges to the commission's determination that the RSR was authorized under R.C. 4928.143(B)(2)(d)**

{¶ 43} In its modified ESP application, AEP sought approval of the nonbypassable RSR under R.C. 4928.143(B)(2)(d). This section states that an ESP may include

> [t]erms, conditions, or charges relating to limitations on customer shopping for retail electric generation service, bypassability, standby, back-up, or supplemental power service, default service, carrying costs, amortization periods, and accounting or deferrals, including future recovery of such deferrals, as would have the effect of stabilizing or providing certainty regarding retail electric service.

Thus, a proposed item in an ESP is authorized if it meets three criteria: (1) it is a term, condition, or charge, (2) it relates to one of the listed items (*e.g.*, limitations on customer shopping, bypassability, carrying costs), and (3) it has the effect of stabilizing or providing certainty regarding retail electric service. The commission found that the RSR was authorized under this section as a charge that relates to default service, promotes stable retail-electric-service prices, and ensures customer certainty regarding retail electric service. ESP Order at 31-32;

First Rehearing Entry at 15. Appellants raise several challenges to the commission's determination. None have merit.

1. *OCC's Proposition of Law No. 3 (Sections A.1 and A.2)*: **Whether the commission failed to apply the statutory definition of "default service" when construing R.C. 4928.143(B)(2)(d)**

**{¶ 44}** OCC first argues that the commission misconstrued the term "default service" in R.C. 4928.143(B)(2)(d) when it approved the RSR. According to OCC, the commission erred when it failed to apply the statutory definition of "default service" set forth in R.C. 4928.14. We find that OCC has forfeited this argument.

**{¶ 45}** In its First Rehearing Entry on January 30, 2013, the commission decided for the first time that the RSR was authorized under R.C. 4928.143(B)(2)(d) as a charge that relates to default service. OCC filed a second application for rehearing, but it never alleged in its second application that the commission erred when it failed to apply the statutory definition of default service. Instead, it argued that the commission's finding that the RSR related to default service was unsupported by the record and not based on specific findings of fact, thereby violating R.C. 4903.09 and 4903.13.

**{¶ 46}** R.C. 4903.10 requires the commission's ruling on any particular issue to be challenged through an application for rehearing before that issue can be appealed. OCC may not argue for the first time in this court that the commission's entry violated R.C. 4928.14. It must first raise the issue with the commission, giving the commission an opportunity to correct the alleged error. Because OCC did not give the commission the opportunity to first address this argument, we lack jurisdiction to consider the argument now. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 66.

**2.** ***OCC's Proposition of Law No. 3 (Section B)*: Whether the commission erred in concluding that the RSR satisfies R.C. 4928.143(B)(2)(d) without finding that it "directly" stabilizes or provides certainty regarding retail electric service**

**{¶ 47}** OCC also contends that the commission erred in finding that the RSR has "the effect of stabilizing or providing certainty regarding retail electric service," as required by R.C. 4928.143(B)(2)(d). According to OCC, under the plain language of the statute, that effect must be direct. OCC maintains that the commission misconstrued the statute when it found that the RSR could be approved even if it had only an *indirect* effect on retail electric service.

**{¶ 48}** Our analysis must begin with the language of the statute. *See In re Application of Ohio Power Co.*, 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, ¶ 20. R.C. 4928.143(B)(2)(d) does not speak to whether the "effect of stabilizing or providing certainty regarding retail electric service" must be direct or indirect. While the stated goal is stable or certain retail electric service, the statute does not tell the commission how to reach it. This gives the commission discretion to determine how the "[t]erms, conditions, or charges" meet the criteria. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 68 ("Any lack of statutory guidance on that point should be read as a grant of discretion"); *Payphone Assn. v. Pub. Util. Comm.*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25 ("When a statute does not prescribe a particular formula, the [commission] is vested with broad discretion").

**{¶ 49}** OCC has not shown an abuse of discretion. R.C. 4928.143(B)(2)(d) does not expressly exclude effects that are indirect; it does not use the word "direct," or even some equivalent. We would have to insert language into the statute to find in favor of OCC's preferred construction. But in construing a statute, we may not add or delete words. *State ex rel. Cincinnati Bell*

*Tel. Co. v. Pub. Util. Comm.*, 105 Ohio St.3d 177, 2005-Ohio-1150, 824 N.E.2d 68, ¶ 32.

3.    ***Ohio Energy Group's Proposition of Law No. 1*: Whether R.C. 4928.143(B)(2)(d) allows the commission to order the recovery of wholesale charges through the RSR**

{¶ 50} Ohio Energy Group argues that the commission cannot order the recovery of deferred wholesale capacity costs from retail customers under R.C. 4928.143(B)(2)(d). According to Ohio Energy, this provision specifically relates to retail electric service, so wholesale costs that are established outside the scope of an ESP and deferred for later recovery cannot be recovered under this provision. But Ohio Energy points to no language in R.C. 4928.143 that prohibits the commission from allowing the recovery of wholesale costs through retail rates. *See Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 53 (rejecting argument when proponent failed to provide rationale justifying decision in its favor).

{¶ 51} Ohio Energy also claims that forcing retail customers to pay wholesale capacity costs that should be charged to CRES providers does not provide stability or certainty regarding retail electric service, as required by R.C. 4928.143(B)(2)(d). The underlying premise of this argument is factual, yet Ohio Energy fails to support its argument with any citations to the record. We reject the argument on that basis. *Allnet Communications Servs., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 206, 638 N.E.2d 516 (1994) (rejecting argument where appellant "provided no further reasoning or record citations to support" it).

**Remaining challenges to the RSR**

1. *OCC's Proposition of Law No. 1***: Whether the commission's order is unlawful and unreasonable because it requires retail consumers to pay twice for the cost of capacity**

{¶ 52} OCC argues that the commission erred in counting capacity costs twice. According to OCC, the company's generation customers are already paying the company for capacity through its standard-service-offer rates. And these same customers will have to pay the RSR, which recovers deferred capacity costs plus interest. Likewise, OCC contends that shopping customers may also be required to pay twice for capacity. These arguments have effectively been resolved by our discussion of the transition-revenue issue.

2. **Kroger's Proposition of Law No. 1: Whether the commission's order is unlawful because it mismatched cost allocation and cost recovery for the RSR, in violation of R.C. 4928.02**

{¶ 53} Kroger raises one proposition of law, arguing that the commission erred when it approved the rate design of the RSR. Kroger claims that although the commission acted appropriately when it permitted AEP to allocate costs for the RSR to customer classes on a demand basis, the commission erred when it then allowed AEP to recover those costs through an energy charge. According to Kroger, the rate design of the RSR is unlawful and unreasonable because it discriminates against Kroger, and other high-demand customers whose energy usage is low relative to their demand due to greater efficiency, by forcing them to subsidize lower-demand, but less efficient, customers. *See* R.C. 4928.02(A) (state policy is to ensure nondiscriminatory and reasonably priced retail electric service). Kroger raises two arguments. We reject both.

a. **Kroger has forfeited its primary argument on appeal**

{¶ 54} Kroger's primary argument on appeal is that the commission failed to cite evidence to support its determination.

{¶ 55} Although not cited by Kroger, R.C. 4903.09 requires the commission to set forth the reasons for its decisions and prohibits summary rulings and conclusions that do not develop the supporting rationale or record. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987); *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30. Kroger is correct that the commission's rehearing entry on this issue contains no citation to the record. Nevertheless, we lack jurisdiction to address Kroger's argument.

{¶ 56} The commission addressed the rate-design issue for the first time in the January 30, 2013 rehearing entry. But Kroger never filed a *second* application for rehearing that alleged error in the commission's January 30 rehearing entry. Therefore, we lack jurisdiction to consider the argument on appeal. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 66.

### b. Kroger's rate-design argument otherwise lacks merit

{¶ 57} Kroger also argues that the rate design of the RSR violates the regulatory principle of cost causation, which requires that rates approved by the regulator reflect the costs actually caused by the customer who pays them. Kroger maintains that the commission misapplied this principle, resulting in a rate design that is inherently flawed and that requires one class of customers to subsidize the other.

{¶ 58} We have long given great deference to the commission on matters of rate design. *See Ohio Consumers' Counsel v. Pub. Util. Comm.*, 127 Ohio St.3d 524, 2010-Ohio-6239, 941 N.E.2d 757, ¶ 13. Our " 'function is not to weigh the evidence or to choose between alternative, fairly debatable rate structures. That would be to interfere with the jurisdiction and competence of the commission and to assume powers which this court is not suited to exercise.' " *Id*.

at ¶ 13, quoting *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 46 Ohio St.3d 105, 108, 346 N.E.2d 778 (1976).

{¶ 59} After review, we find that Kroger has failed to demonstrate any error, let alone reversible error. Kroger cites no authority that the commission is bound to apply the regulatory principle of cost causation whenever it is deciding an issue of rate design. Therefore, we can reject this argument on that ground. *See Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134, 926 N.E.2d 261, ¶ 20.

## II. Challenges against the ESP based on discriminatory pricing

{¶ 60} OCC argues that the commission approved capacity prices that discriminate against standard-service-offer ("SSO") customers (nonshoppers), in favor of marketers and shopping customers. We find that OCC has failed to demonstrate error.

{¶ 61} Ohio law does "not require uniformity in utility prices and rates." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 109 Ohio St.3d 328, 2006-Ohio-2110, 847 N.E.2d 1184, ¶ 24. Rather, the statutes prohibit a utility from charging different rates only when performing " 'a like and contemporaneous service under substantially the same circumstances and conditions.' " *Id.* at ¶ 23, quoting R.C. 4905.33, and construing R.C. 4905.35 as having "the same effect," *id.* OCC, however, provides no evidence that SSO customers are situated similarly to CRES providers when it comes to the provision of capacity service.

{¶ 62} Likewise, OCC offers no evidence or explanation of any similarity between SSO customers and shopping customers when it comes to capacity service. AEP provides capacity to SSO customers as part of its bundled generation service, but it does not provide capacity directly to shopping customers. Instead, AEP sells generation capacity wholesale to CRES providers, who in turn sell generation service directly to shopping customers, with each

CRES provider deciding how much of the wholesale capacity cost to pass on to retail consumers. First Rehearing Entry at 33.

{¶ 63} In sum, OCC has not carried its burden, and therefore we reject the arguments on that ground. *See generally In re Application of Duke Energy Ohio, Inc.*, 131 Ohio St.3d 487, 2012-Ohio-1509, 967 N.E.2d 201, ¶ 17-18 (appellant bears the burden on appeal of showing that the order is unlawful or unreasonable).

## AEP's Cross-Appeal

I.  *AEP's Proposition of Law No. V1*: **Whether the commission erred in determining the threshold for the "significantly excessive earnings" test**

{¶ 64} AEP first argues on cross-appeal that the commission erred when it imposed a significantly-excessive-earnings test ("SEET") threshold for the term of the ESP that was arbitrary and unsupported by the record. Electric-distribution utilities that opt to provide service under an electric-security plan must undergo an annual earnings review. R.C. 4928.143(F) requires the commission annually to consider whether the plan resulted in "significantly excessive earnings" compared to companies facing "comparable" risk. If the ESP resulted in significantly excessive earnings, the utility must return the excess to its customers. *Id*. In the order below, the commission set the SEET threshold at 12 percent, meaning that only a return on investment of more than 12 percent would be considered significantly excessive. ESP Order at 37; First Rehearing Entry at 41-42.

{¶ 65} Whether a plan resulted in excessive earnings must be measured by

> whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and

financial risk, with such adjustments for capital structure as may be appropriate.

R.C. 4928.143(F). AEP argues that in setting the SEET threshold, the commission did not compare AEP's return on common equity with the returns of comparable publicly traded companies that were earned *during the same period*. Moreover, the company asserts that the commission never explained why it failed to conduct the statutorily required comparison.

{¶ 66} AEP is correct that the commission failed to explain its decision. AEP complained on rehearing that the threshold was not based on "estimates of the 'return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and financial risk' to AEP Ohio, as the SEET statute requires." The company also complained about the commission's lack of explanation for departing from the statutory process. The commission never offered a response to AEP's claims and thus failed to explain its decision. This was error. *See In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.*, 140 Ohio St.3d 352, 2014-Ohio-3764, 18 N.E.3d 1157, ¶ 45. Therefore, we reverse this part of the order and remand so that the commission can address this issue in the first instance.

## II. AEP's Proposition of Law No. V1I: Whether the commission's order impaired the company's right to withdraw the ESP under R.C. 4928.143(C)(2)(a)

{¶ 67} AEP's second argument on cross-appeal is that the commission's order deprived the company of its right under R.C. 4928.143(C)(2)(a) to withdraw the ESP. R.C. 4928.143(C)(1) requires the commission to do one of three things when considering an ESP application: (1) "approve," (2) "modify and approve," or (3) "disapprove" the application. Under R.C. 4928.143(C)(2)(a), if the commission issues an order that "modifies and approves an application," the

utility "may withdraw the application, thereby terminating it, and may file a new standard service offer." AEP asserts that it cannot meaningfully exercise its statutory right to withdraw the modified ESP because the order directed the company to accelerate the use of energy auctions, but failed to address auction-design and related issues, deferring those issues for resolution in another proceeding. This argument lacks merit.

**{¶ 68}** Nothing prevented AEP from withdrawing the ESP once the commission issued its order modifying the timing of the auctions and informed the company of its plan to decide auction-design issues in another case. AEP complains that it cannot exercise its right to withdraw when it does not know and cannot even anticipate the actual economic effect of the specific design of the auctions until later. But AEP overlooks the fact that it was the one who had proposed that the commission decide the details of the competitive-auction process in a separate proceeding. The company cannot take advantage of an error that it itself invited or induced the commission to make. *State ex rel. Johnson v. Ohio Adult Parole Auth.*, 95 Ohio St.3d 463, 2002-Ohio-2481, 768 N.E.2d 1176, ¶ 6; *Fostoria v. Ohio Patrolmen's Benevolent Assn.*, 106 Ohio St.3d 194, 2005-Ohio-4558, 833 N.E.2d 720, ¶ 12.

### III. AEP's Proposition of Law No. VIII: Whether the commission erred when it extended the state compensation mechanism to standard-service-offer auctions[4]

**{¶ 69}** In its final argument on cross-appeal, AEP contends that the commission erred when it extended the state compensation mechanism to SSO auctions and SSO customers. But this argument was not set forth in AEP's notice of cross-appeal and is therefore forfeited. R.C. 4903.13 (the procedure for seeking reversal of a commission order is through a notice of appeal "setting forth the

---

[4] At page 47 of its second merit brief, AEP misidentifies its final proposition of law as "No. IV," instead of No. VIII.

order appealed from and the errors complained of"); *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 21; *In re Complaint of Smith v. Ohio Edison Co.*, 137 Ohio St.3d 7, 2013-Ohio-4070, 996 N.E.2d 927, ¶ 28.

## CONCLUSION

{¶ 70} For the foregoing reasons, we reverse the commission's orders in part, affirm them in part, and remand the cause to the commission for further review.

Orders affirmed in part
and reversed in part,
and cause remanded.

O'DONNELL and FRENCH, JJ., concur.

O'CONNOR, C.J., concurs in part and dissents in part with an opinion that LANZINGER, J., joins.

PFEIFER, J., concurs in part and dissents in part with an opinion that O'NEILL, J., joins.

_____

**O'CONNOR, C.J., concurring in part and dissenting in part.**

{¶ 71} I believe that the majority prematurely reaches its conclusions that the commission's order violates R.C. 4928.38 and that AEP is recovering the equivalent of unlawful transition revenue through the Retail Stability Rider ("RSR"). I thus dissent in part.

## ANALYSIS

{¶ 72} R.C. Chapter 4928 is a labyrinthian scheme that governs Ohio's retail electric service, i.e., "any service involved in supplying or arranging for the supply of electricity to ultimate consumers in this state, from the point of generation to the point of consumption." R.C. 4928.01(27). Among its provisions are those permitting and forbidding the recovery of transition costs.

*FirstEnergy Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 401, 2002-Ohio-2430, 768 N.E.2d 648, ¶ 14; R.C. 4928.37; R.C. 4928.39; R.C. 4928.141(A).

{¶ 73} In the proceedings below, the commission found that R.C. 4928.143(B)(2)(d) permitted American Electric Power ("AEP") to include the RSR as part of its electric security plan ("ESP"). Pub. Util. Comm. Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM, 31-32 (Aug. 8, 2012) (the "ESP Order"). The practical effect of that decision was that AEP collected over $500,000,000 in additional revenue through the RSR, which AEP had designed, in part, to recover lost revenue from competitive retail-electric-service providers.

{¶ 74} Appellant the Office of the Ohio Consumers' Counsel contends that the commission acted improperly in allowing AEP to collect the revenue because the statutory period set by the General Assembly for the recovery of transition costs had ended. *See* R.C. 4928.37(A)(1), 4928.38, and 4928.40(A). The majority agrees and reverses the approval of the RSR on the basis that AEP is recovering the equivalent of unlawful transition revenue through the rider in violation of R.C. 4928.38. But in doing so, the majority ignores what could be significant language in the ESP statute, R.C. 4928.143(B), by relegating that language to a footnote and then ignoring it. Majority Opinion at fn. 3.

{¶ 75} R.C. 4928.143(B) contains broadly worded language that states "[n]otwithstanding any other provision" in R.C. Title 49 "to the contrary," except the provisions in "division (D) of this section, divisions (I), (J), and (K) of section 4928.20, division (E) of section 4928.64, and section 4928.69 of the Revised Code," an electric security plan may provide or include, without limitation, a host of costs the utility incurs in providing electric service.[5]

---

[5] R.C. 4928.143(B) provides:

*Notwithstanding any other provision* of Title XLIX of the Revised Code to the contrary except division (D) of this section, divisions (I), (J), and (K) of section 4928.20, division (E) of section 4928.64, and section 4928.69 of the Revised Code:

(1) An electric security plan shall include provisions relating to the supply and pricing of electric generation service. * * *

(2) The plan may provide for or include, without limitation, any of the following:

(a) Automatic recovery of any of the following costs of the electric distribution utility, provided the cost is prudently incurred: the cost of fuel used to generate the electricity supplied under the offer; the cost of purchased power supplied under the offer, including the cost of energy and capacity, and including purchased power acquired from an affiliate; the cost of emission allowances; and the cost of federally mandated carbon or energy taxes;

(b) A reasonable allowance for construction work in progress for any of the electric distribution utility's cost of constructing an electric generating facility or for an environmental expenditure for any electric generating facility of the electric distribution utility, provided the cost is incurred or the expenditure occurs on or after January 1, 2009. Any such allowance shall be subject to the construction work in progress allowance limitations of division (A) of section 4909.15 of the Revised Code, except that the commission may authorize such an allowance upon the incurrence of the cost or occurrence of the expenditure. No such allowance for generating facility construction shall be authorized, however, unless the commission first determines in the proceeding that there is need for the facility based on resource planning projections submitted by the electric distribution utility. Further, no such allowance shall be authorized unless the facility's construction was sourced through a competitive bid process, regarding which process the commission may adopt rules. An allowance approved under division (B)(2)(b) of this section shall be established as a nonbypassable surcharge for the life of the facility.

(c) The establishment of a nonbypassable surcharge for the life of an electric generating facility that is owned or operated by the electric distribution utility, was sourced through a competitive bid process subject to any such rules as the commission adopts under division (B)(2)(b) of this section, and is newly used and useful on or after January 1, 2009, which surcharge shall cover all costs of the utility specified in the application, excluding costs recovered through a surcharge under division (B)(2)(b) of this section. However, no surcharge shall be authorized unless the commission first determines in the proceeding that there is need for the facility based on resource planning projections submitted by the electric distribution utility. Additionally, if a surcharge is authorized for a facility pursuant to plan approval under division (C) of this section and as a condition of the continuation of the surcharge, the electric distribution utility shall dedicate to Ohio consumers the capacity and energy and the rate

associated with the cost of that facility. Before the commission authorizes any surcharge pursuant to this division, it may consider, as applicable, the effects of any decommissioning, deratings, and retirements.

(d) Terms, conditions, or charges relating to limitations on customer shopping for retail electric generation service, bypassability, standby, back-up, or supplemental power service, default service, carrying costs, amortization periods, and accounting or deferrals, including future recovery of such deferrals, as would have the effect of stabilizing or providing certainty regarding retail electric service;

(e) Automatic increases or decreases in any component of the standard service offer price;

(f) Consistent with sections 4928.23 to 4928.2318 of the Revised Code, both of the following:

(i) Provisions for the electric distribution utility to securitize any phase-in, inclusive of carrying charges, of the utility's standard service offer price, which phase-in is authorized in accordance with section 4928.144 of the Revised Code;

(ii) Provisions for the recovery of the utility's cost of securitization.

(g) Provisions relating to transmission, ancillary, congestion, or any related service required for the standard service offer, including provisions for the recovery of any cost of such service that the electric distribution utility incurs on or after that date pursuant to the standard service offer;

(h) Provisions regarding the utility's distribution service, including, without limitation and notwithstanding any provision of Title XLIX of the Revised Code to the contrary, provisions regarding single issue ratemaking, a revenue decoupling mechanism or any other incentive ratemaking, and provisions regarding distribution infrastructure and modernization incentives for the electric distribution utility. The latter may include a long-term energy delivery infrastructure modernization plan for that utility or any plan providing for the utility's recovery of costs, including lost revenue, shared savings, and avoided costs, and a just and reasonable rate of return on such infrastructure modernization. As part of its determination as to whether to allow in an electric distribution utility's electric security plan inclusion of any provision described in division (B)(2)(h) of this section, the commission shall examine the reliability of the electric distribution utility's distribution system and ensure that customers' and the electric distribution utility's expectations are aligned and that the electric distribution utility is placing sufficient emphasis on and dedicating sufficient resources to the reliability of its distribution system.

(i) Provisions under which the electric distribution utility may implement economic development, job retention, and energy efficiency programs, which provisions may allocate program costs across all

**{¶ 76}** The provision could be construed to allow an ESP to include charges that other provisions of R.C. Title 49 prohibit. Here, even assuming that the majority is correct that R.C. 4928.38 bars the recovery of transition revenue, R.C. 4928.143(B) nevertheless could be read to create an exception to the prohibition on transition revenue as long as the revenues are recoverable under the requirements of R.C. 4928.143(B)(2). Stated differently, the word "notwithstanding" could render R.C. 4928.38 inapplicable if the revenues are recoverable under one of the many provisions of R.C. 4928.143(B)(2).

**{¶ 77}** I recognize that the commission did not rely on the "notwithstanding" provision of R.C. 4928.143(B) in the proceedings below. And although it appears that no party has squarely raised the issue to this court, two parties, FirstEnergy Solutions and IEU, cited the "notwithstanding" provision of R.C. 4928.143(B) before the commission in relation to another rider (the Generation Resource Rider). ESP Order at 21. In that context, the parties' interpretation of the provision suggests that the "notwithstanding" clause could be read broadly as an exception. The commission, however, decided the question on other grounds and never addressed the "notwithstanding" argument, *see* ESP Order at 19-25, and I am unaware of any case in which the commission has considered or clarified the particular language of R.C. 4928.143(B).

**{¶ 78}** We could decide the meaning of the provision in the first instance. But we can, and should, consider the expertise of a state agency in interpreting a law where, as here, there are "highly specialized issues" involved and where "agency expertise" would be "of assistance in discerning the presumed intent of

---

classes of customers of the utility and those of electric distribution utilities in the same holding company system.

(Emphasis added.)

our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

{¶ 79} Given that the "notwithstanding" provision could create an exception to the prohibition against the recovery of transition revenue and that the commission has offered no guidance on the meaning of that provision, I would remand the cause to the commission to consider and interpret the statutory language before rendering a decision on whether AEP is improperly recovering transition costs. *See, e.g., In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 31-35. By doing so, we would not only respect the role of the General Assembly to create the framework by which utilities must provide service to the millions of Ohio consumers who rely on safe, affordable electrical service, but also the collective expertise of the commission in a complex area of law that implicates important public-health and financial-policy considerations.

LANZINGER, J., concurs in the foregoing opinion.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 80} I concur in the portion of the majority opinion that concludes that the Public Utilities Commission ("PUCO") erred when it allowed Ohio Power to collect the equivalent of transition revenues.

{¶ 81} But I dissent from the portion of the majority opinion that allows the recapture of a discount offered to marketers from retail customers. Pursuant to the PUCO order before us, Ohio Power is allowed to sell capacity to marketers at a rate that is less than its retail customers pay. That does not, by itself, offend any sense of justice or fair play. But requiring the retail customers, who already pay full cost, to make up the difference between the rate Ohio Power charges the marketers and the rate it charges the public does. We are not talking about a small number. The discount that Ohio Power has offered to marketers, some of

whom might be its own subsidiaries, amounts over a period of years to close to $650 million. No statutory authority enabled the PUCO to allow Ohio Power to recoup from its retail customers the discount it grants to marketers. The PUCO justifies the recapture of the discount by saying that it promotes stable electric service prices. Perhaps that is true, but it also results in artificially high retail utility costs.

{¶ 82} The PUCO has determined that Ohio Power's cost of providing capacity is $188.88 per megawatt day. *In re Comm. Rev. of Capacity Charges of Ohio Power Co.,* Pub. Util. Comm. No. 10-2929-EL-UNC, at 33 (July 2, 2012). In its brief, the Office of the Ohio Consumers' Counsel stated that the current standard-service-offer rate charged to retail customers includes a capacity charge of approximately $355.72 per megawatt-day. If true, this outrageous overcharge to Ohio Power's own nonshopping retail customers is unwarranted and outside the purview of the rate-setting mechanism. R.C. 4928.144, which ostensibly justifies the PUCO's action, allows rates to be phased in, it does not allow the recapture of a discount offered to marketers from retail customers. In essence, the PUCO is requiring retail customers, who in the main do not shop for service, to subsidize customers who do shop. The authority to do this is not found in 2008 Am.Sub.S.B. No. 221 or anywhere else in the Revised Code.

{¶ 83} In the past, Ohio Power's capacity charges have been based on rates established by auctions held by PJM Interconnection, L.L.C. *See* Pub. Util. Comm. No. 10-2929-EL-UNC at 14. I would send this case back to the PUCO with instructions for it to determine the appropriate market price for capacity generation and to limit the rates it allows Ohio Power to charge to that market price.

{¶ 84} The outcome of this case appears to provide another extra-legal gift from the PUCO to the management and shareholders of AEP, the owner of Ohio Power, this time of roughly $500 million from the retail stability charge. For

other examples, *see In re Application of Ohio Power Co.*, 144 Ohio St.3d 1, 2015-Ohio-2056, 40 N.E.3d 1060, ¶ 48 (Pfeifer, J., dissenting) (Ohio Power received an unwarranted $130 million); *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 56 (Pfeifer, J., dissenting) (AEP allowed to retain $368 million of charges that were unjustified).

**{¶ 85}** Based on the foregoing, I concur in part and dissent in part.

O'NEILL, J., concurs in the foregoing opinion.

————————————

Bruce J. Weston, Consumers' Counsel, and Maureen R. Grady, Terry L. Etter, and Joseph P. Serio, Assistant Consumers' Counsel, for appellant and cross-appellee Ohio Consumers' Counsel.

Boehm, Kurtz & Lowry, Michael Kurtz, David Boehm, and Jody Kyler Cohn, for appellant and cross-appellee Ohio Energy Group.

Taft, Stettinius & Hollister, L.L.P., Mark S. Yurick, and Zachary D. Kravitz, for appellant Kroger Company.

Michael DeWine, Attorney General, and William L. Wright, Werner L. Margard III, and Steven L. Beeler, Assistant Attorneys General, for appellee and cross-appellee, Public Utilities Commission of Ohio.

Matthew J. Satterwhite and Steven T. Nourse; Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, James B. Hadden, Daniel R. Conway, and L. Bradfield Hughes; and MoloLamken, L.L.P., Jeffrey A. Lamken, and Martin V. Totaro, for appellee and cross-appellant, Ohio Power Company.

————————————