**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Icebreaker Windpower, Inc.*, Slip Opinion No. 2022-Ohio-2742.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2742

IN RE APPLICATION OF ICEBREAKER WINDPOWER, INC., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED FOR AN ELECTRIC GENERATING FACILITY IN CUYAHOGA COUNTY, OHIO;

DEMPSEY ET AL., APPELLANTS; POWER SITING BOARD, APPELLEE;

ICEBREAKER WINDPOWER, INC., INTERVENING APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Icebreaker Windpower, Inc.*, Slip Opinion No. 2022-Ohio-2742.]**

*Power Siting Board—Offshore wind-powered electric-generation facility—Application for certificate of environmental compatibility and public need—R.C. 4906.10(A)—Power Siting Board's order granting certificate subject to conditions affirmed—Board's authority under R.C. 4906.10(A)(6) does not extend to the power to make public-trust determinations.*

(No. 2021-0153—Submitted December 7, 2021—Decided August 10, 2022.)

APPEAL from the Power Siting Board, No. 16-1871-EL-BGN.

————————————

**BRUNNER, J.**

**{¶ 1}** Appellee, the Ohio Power Siting Board ("the board"), approved the application of intervening appellee, Icebreaker Windpower, Inc. ("Icebreaker"), for a certificate of environmental compatibility and public need to build a six-turbine wind-powered electric-generation facility in Lake Erie. Appellants, W. Susan Dempsey and Robert M. Maloney (hereafter, "the residents"), who are residents of the village of Bratenahl on the southern shore of Lake Erie, have appealed the board's decision granting the certificate, raising two propositions of law. First, they argue that there was insufficient evidence before the board for it to determine (1) the nature of the probable environmental impact of the project under R.C. 4906.10(A)(2) and (2) whether the project represents the minimum adverse environmental impact under R.C. 4906.10(A)(3). Second, they argue that the board's decision to issue the certificate violated the public-trust doctrine and thus the project does not serve the public interest, convenience, and necessity under R.C. 4906.10(A)(6).

**{¶ 2}** For the reasons discussed below, we affirm the board's decision.

## I. FACTS AND PROCEDURAL BACKGROUND

**{¶ 3}** On February 1, 2017, Icebreaker filed an application with the board for a certificate to build a six-turbine wind-powered electric-generation facility on approximately 4.2 acres of submerged land in Lake Erie located between eight and ten miles off the shore of Cleveland. The project would be the first freshwater offshore wind-powered electric-generation facility in North America. It has been described as a small-scale demonstration project that will provide valuable information as to how offshore wind facilities interact with the environment and that will test the viability of large-scale wind facilities on Lake Erie and the other Great Lakes. *See* Power Siting Bd. No. 16-1871-EL-BGN, ¶ 2 (May 21, 2020).

**{¶ 4}** The proposed wind farm's estimated electric-generation capacity is 20.7 megawatts, making it an "economically significant wind farm," R.C. 4906.13(A) and Ohio Adm.Code 4906-1-01(R), the construction of which requires the board's approval, R.C. 4906.10 and 4906.20(A). R.C. 4906.10(A) provides that the board shall not grant a certificate for the construction, operation, and maintenance of a major utility facility unless it first makes eight substantive findings, including "[t]he nature of the probable environmental impact" of the facility, R.C. 4906.10(A)(2), and that "[t]he facility represents the minimum adverse environmental impact," R.C. 4906.10(A)(3).

**{¶ 5}** Several parties, including the residents, intervened before the board. The residents do not want the facility to be built on Lake Erie, because they fear that the project could lead to additional wind farms being built on the lake. The most contentious issue before the board was whether Icebreaker had sufficiently demonstrated under R.C. 4906.10(A)(2) and (3) the proposed facility's probable environmental impact on birds and bats. The residents argued that the board could not determine the facility's probable impact on birds and bats based on the evidence that Icebreaker had submitted. The residents also claimed that the project violates the public-trust doctrine, which provides that the state holds title to Lake Erie in trust for the benefit of the people of Ohio, *State ex rel. Squire v. Cleveland*, 150 Ohio St. 303, 82 N.E.2d 709 (1948), paragraph two of the syllabus.

**{¶ 6}** On September 4, 2018, Icebreaker entered a joint stipulation with several parties that purported to resolve most of the issues in the case. The residents and the board's staff opposed the stipulation. Icebreaker filed a revised stipulation on May 15, 2019. The staff joined the revised stipulation, leaving only the residents opposing Icebreaker's application.

**{¶ 7}** On May 21, 2020, the board issued an order approving the revised stipulation with certain modifications, thereby granting a certificate to Icebreaker for the proposed project, subject to certain conditions. The board found, contrary

to the residents' arguments, that Icebreaker had submitted sufficient evidence for the board to determine the probable environmental impact of the project on birds and bats. However, the board found it necessary to impose a different risk-mitigation measure than that which the revised stipulation proposed. The board therefore modified the stipulation to require that the turbines be nonoperational from dusk to dawn for eight months of the year until otherwise ordered by the board. The board reasoned that it was necessary to shut down the turbines during the specified times due to the lack of data regarding the actual impact that the project would have on birds and bats at the project site and some uncertainty regarding Icebreaker's postconstruction collision-monitoring technology.

{¶ 8} As for the residents' argument that the project violated the public-trust doctrine, the board determined that it lacked jurisdiction over the issue. The board, however, went on to reject the argument that the project violated the public-trust doctrine.

{¶ 9} The residents and Icebreaker both sought rehearing of the board's order. On October 8, 2020, the board issued an entry denying the residents' rehearing application. The board, however, granted Icebreaker's rehearing application in part and removed the turbine-shutdown requirement imposed in the May 21 order. The board determined that it was unnecessary to impose that requirement because the order had approved a process ensuring that Icebreaker would provide the board with the necessary information both before construction of the wind farm and during its operation. Power Siting Bd. No. 16-1871-EL-BGN, ¶ 30-32, 36 (Oct. 8, 2020).

{¶ 10} On November 5, 2020, the residents filed a rehearing application challenging the board's removal of the turbine-shutdown requirement. The board did not rule on the rehearing application within 30 days; thus, it was denied by operation of law. *See* R.C. 4903.10(B).

4

**{¶ 11}** The residents appealed the board's determination to this court as of right. The board and Icebreaker filed merit briefs defending the order. Amici curiae Great Lakes Towing Company and Ohio Environmental Council submitted briefs urging affirmance of the order.

## II. STANDARD OF REVIEW

**{¶ 12}** Under R.C. 4906.12, we apply the same standard of review to power-siting determinations that we apply to orders of the Public Utilities Commission of Ohio. *In re Application of Black Fork Wind Energy, L.L.C.*, 138 Ohio St.3d 43, 2013-Ohio-5478, 3 N.E.3d 173, ¶ 10. Under this standard, we will reverse, vacate, or modify an order of the board only when, upon consideration of the record, we conclude that the order was unlawful or unreasonable. R.C. 4903.13. "We will not reverse or modify a board decision as to questions of fact when the record contains sufficient probative evidence to show that the board's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *In re Application of Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, ¶ 7. We review questions of law de novo. *See id*.

## III. ANALYSIS

**{¶ 13}** Ohio law prohibits the board from granting a certificate of environmental compatibility and public need unless it first determines the nature of the probable environmental impact of the facility, R.C. 4906.10(A)(2), that the facility represents the minimum adverse environmental impact, R.C. 4906.06(A)(3), and that the facility will serve the public interest, convenience, and necessity, R.C. 4906.10(A)(6). In their first proposition of law, the residents raise various challenges to the board's determinations under R.C. 4906.10(A)(2) and (3). In their second proposition of law, the residents argue that the board's decision granting the certificate violated the public-trust doctrine and, by extension, R.C. 4906.10(A)(6).

**A. Proposition of law No. 1: Whether the board erred in determining that Icebreaker satisfied the requirements of R.C. 4906.10(A)(2) and (3)**

**{¶ 14}** In their first proposition of law, the residents contest the board's determinations under R.C. 4906.10(A)(2) and (3), arguing that Icebreaker failed to submit sufficient evidence for the board to properly assess the environmental risk that the project poses to birds and bats. The board counters that the evidence in the record was abundant and that it thoroughly considered it and made all the findings required by R.C. 4906.10(A). Likewise, Icebreaker maintains that the board made valid findings under R.C. 4906.10(A) that were fully supported by extensive evidence in the record.

**{¶ 15}** Upon review, we hold that the board's determinations under R.C. 4906.10(A)(2) and (3) were lawful and reasonable. Therefore, we reject the residents' first proposition of law.

*1. Record evidence supports the board's determination that Icebreaker satisfied the requirements of R.C. 4906.10(A)(2)*

**{¶ 16}** The board found that the probable environmental impact of the project can be determined by evaluating migration patterns near the project site and reviewing data regarding land-based wind farms in the Great Lakes region. According to the board, the project was expected to primarily affect migrating birds and bats, especially migrating nocturnal birds. The board found that the facility would affect migrating birds and bats through collision, avoidance, and attraction. But the board determined that any environmental impact would be severely reduced by the project's small scale, its location several miles offshore, and the flight patterns of migrating birds. We hold that the board's determinations in that regard were amply supported by the record.

**{¶ 17}** First, the board generally cited myriad scientific studies submitted as evidence that monitored birds and bats flying in the vicinity of the project site and other offshore and near-shore parts of Lake Erie. The board specifically cited

6

radar monitoring of the project site, acoustic studies of bird and bat activity, aerial studies of birds in the project area and birds migrating over Lake Erie, and a wind-turbine-placement-favorability analysis conducted by the Ohio Department of Natural Resources (hereafter, "ODNR").

{¶ 18} Second, the board cited evidence showing that the small scale of the project (six turbines) and its location between eight and ten miles offshore severely reduced the impact that the facility will have on birds and bats. The board found that because the project is located several miles offshore, it will not impact the habitats of nesting birds or roosting bats. The board also determined that eagles and other raptors were concentrated near the shoreline and were not expected to fly near the project site and that very few waterfowl venture as far from the shoreline as the project site.

{¶ 19} Third, the board cited the testimony of staff witness Erin Hazelton, who testified that the nature of the probable environmental impact on birds and bats will be collision, avoidance, and attraction. The board also cited radar studies showing that most of the migrating birds are expected to fly above the rotor-swept zone of the turbines and that only a small percentage of the birds are expected to fly in the rotor-swept zone.

{¶ 20} Fourth, the board relied on a review by Icebreaker's expert witness, Dr. Caleb Gordon, of 42 land-based wind farms in the Great Lakes region, as well as the board's staff's own review of Ohio's land-based wind-farm projects. Based on this evidence, the board estimated that the project could be expected to cause between 21 and 42 fatal bird collisions per year. In addition, the board cited evidence suggesting that an offshore facility may have less of an impact on nocturnal migrating birds than a land-based wind facility.

{¶ 21} Fifth, the board relied on studies of bat fatalities at 55 land-based wind-farm projects, as well as a bat-acoustic survey of activity near the project area. Based on this evidence, the board found that the collision risk for bats near the

project is low because bat activity is significantly greater on land than offshore (almost ten times more frequent in terrestrial environments near Cleveland than offshore).

{¶ 22} In summary, the board's order contains a lengthy discussion of the "nature of the probable environmental impact," a factor that must be determined under R.C. 4906.10(A)(2). On appeal, the residents bear the burden of demonstrating that the board's decision was against the manifest weight of the evidence and was "so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty." *Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, at ¶ 7. As explained below, the residents have failed to meet that burden.

2. *The residents' evidence does not justify reversing the board's determination under R.C. 4906.10(A)(2)*

{¶ 23} As shown above, the residents have not established that the board's determination under R.C. 4906.10(A)(2) lacked support in the record. And what the residents attempt to establish through their evidence is either irrelevant or does not justify reversal of the board's determination.

### a. The residents' request for additional preconstruction radar monitoring

{¶ 24} The residents first point to a lack of data that they argue was necessary for the board to make a determination under R.C. 4906.10(A)(2). They claim that Icebreaker failed to submit sufficient preconstruction radar data showing the number and density of birds and bats that fly through the project's rotor-swept zone. The residents assert that without this data, the board lacked the evidence necessary to assess the risk that the project poses to birds and bats.

{¶ 25} The board determined that additional preconstruction radar monitoring was not necessary to a determination under R.C. 4906.10(A)(2), because the board's task under that provision is to "identif[y] the nature of the probable impact, not the actual impact." Power Siting Bd. No. 16-1871-EL-BGN,

8

at ¶ 107 (May 21, 2020). The board determined that evidence in the form of studies of land-based wind farms and existing radar data for migrating birds and bats at the project site was sufficient to determine the probable impact—i.e., collision, avoidance, and attraction—on birds and bats under R.C. 4906.10(A)(2). It is true that the board acknowledged that preconstruction radar monitoring at the project site would provide more detail regarding the flight patterns of migrating birds and bats, particularly in the rotor-swept zone. But the board explained that the purpose of preconstruction radar monitoring is to verify the number and density of birds and bats in the project area so as to establish a baseline for comparison with postconstruction radar-monitoring data. Accordingly, the board determined that preconstruction radar data for the project site was necessary to ensure that any adverse environmental impact was minimal under R.C. 4906.10(A)(3), but that such data was not relevant to a determination of the probable environmental impact under R.C. 4906.10(A)(2).

{¶ 26} The residents maintain that additional preconstruction radar monitoring was necessary to determine the project's probable environmental impact. According to the residents, Icebreaker acknowledged the need for additional radar studies in the following excerpt from its application:

> While state and federal agencies have agreed that the information regarding the impact to fish and wildlife supports a finding that the permitting processes at the state and federal levels can move forward, *they have requested that [Icebreaker] conduct additional field surveys prior to construction in order to provide a direct comparison with postconstruction survey information, as a means to assess the level of wildlife impact during the operational phase of the project.*

(Emphasis added.) The residents maintain that despite these requests from other state and federal agencies, Icebreaker has failed "to collect and submit to the Board pre-construction radar studies for the rotor-swept zone of the Project site."

{¶ 27} The language from Icebreaker's application quoted above, however, does not help the residents' claim that Icebreaker needed to submit radar studies for the rotor-swept zone *before* the board issued the certificate. The excerpt expressly states that "the permitting processes at the state * * * level[] can move forward." Likewise, their reliance on the emphasized language from the excerpt is equally unavailing because the excerpt says that the state and federal agencies requested the additional field surveys "prior to construction," not prior to certification.

{¶ 28} Moreover, the residents have failed to acknowledge that what these agencies requested is precisely what the board has ordered. The board issued Icebreaker a certificate subject to certain conditions. Relevant here is revised stipulation condition No. 21, which requires Icebreaker to complete up to two years of preconstruction radar monitoring and produce viable data for at least 75 percent of the survey hours before construction may begin. The monitoring program must also be able to determine the flight altitude of birds and bats flying near and through the rotor-swept zone. Also relevant is revised stipulation condition No. 22, which requires Icebreaker to demonstrate prior to construction that the requirements for radar monitoring set forth in condition No. 21 have been satisfied for at least one spring, summer, and fall migration season. And once the facility becomes operational, Icebreaker must repeat the radar-monitoring process to determine the precise impact of the project on birds and bats, including behavioral impacts such as attraction and avoidance.

{¶ 29} In summary, the board required Icebreaker to submit evidence that the residents now assert was necessary to grant the certificate—namely, additional preconstruction radar studies that will then be used to assess the actual impact on birds and bats once the project becomes operational. And although we do not

conclude that the board erred, the residents have not shown that the board's failure to require that the requested monitoring be conducted before issuance of the certificate appreciably affected them. *See Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, at ¶ 15 (this court will not reverse the board's order unless the appellant shows prejudice stemming from the board's error). Therefore, we hold that the residents have not demonstrated reversible error.

### b. *The residents' claim that Icebreaker's migration evidence is misleading*

{¶ 30} The residents also cite a letter from the United States Fish and Wildlife Service for the proposition that "assertions made by Icebreaker that birds and bats migrate *around* Lake Erie, instead of crossing it, are affirmatively misleading." (Emphasis sic.) The residents' reliance on the letter is misplaced.

{¶ 31} The Fish and Wildlife Service provided the letter in response to a draft environmental assessment for the proposed project that was prepared by the United States Department of Energy. The letter questions recent marine radar studies cited in the assessment that demonstrate that migrating birds avoid flying over large bodies of water like Lake Erie, because other studies demonstrate that large numbers of migrating birds do fly over large bodies of water. The residents, however, overlook the fact that the board never found that migrating birds avoid flying over Lake Erie and instead fly around it. Rather, the board expressly found that birds are expected to migrate north and south over Lake Erie, and the residents do not challenge that finding.

### c. *The residents' reliance on statements of the board's staff's counsel and on the board chairman's concurring opinion on rehearing*

{¶ 32} The residents argue that the board's staff admitted that additional preconstruction radar data was necessary to determine the probable impact of the project on birds and bats. The residents refer to the staff's motion to suspend the procedural schedule, in which staff requested "additional supplemental information on the viability and design of the pre- and post-construction radar monitoring

protocol that [Icebreaker] intends to utilize at the project site for determining project impacts * * * [, because] this information is necessary to measure the effect of off-shore turbines on birds and bats."

{¶ 33} Counsel's statement in a prehearing motion describing the staff's characterization of the quality of existing evidence is not record evidence. *See Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, at ¶ 24. But even if it were record evidence, the residents have acknowledged that staff later changed its position and determined that it had sufficient information to determine the probable environmental impact of the project.

{¶ 34} The residents also claim that the board chairman undermined the board's order when, in their view, he stated in his concurring opinion on rehearing that the probable and actual environmental impact of the project could not be determined without evidence establishing the number and density of birds and bats that fly through the rotor-swept zone. This argument lacks merit for two reasons.

{¶ 35} First, the residents have taken the chairman's statement out of context. The chairman did state in his concurring opinion that the order "recognized an unlawful and unreasonable deficiency contained in the [revised stipulation]." Power Siting Bd. No. 16-1871-EL-BGN, at 3 (Oct. 8, 2020) (Chairman Sam Randazzo, concurring). The residents emphasize the chairman's statement that there were "open and significant issues associated with the identification and mitigation of the risks to avian and bat populations." But as we read it, the chairman was referring to the revised stipulation's failure to "identify a lawful and reasonable *process*" for resolving the risk issues, not the fact that those issues were left open and needed to be resolved. (Emphasis added.) *Id.* (Chairman Sam Randazzo, concurring).

{¶ 36} Moreover, our role here is to determine whether the board's order was lawful and reasonable. And we note that the chairman's concurring opinion is not the order of the board.

*3. The residents have failed to demonstrate that the board erred in determining that the project satisfied the requirements of R.C. 4906.10(A)(3)*

**{¶ 37}** When the board approved Icebreaker's certificate, it left several disputed issues unresolved. Among other things, the board required Icebreaker to (1) demonstrate compliance with certain requirements for the preconstruction radar monitoring and data gathering discussed above, (2) determine whether the preconstruction radar technology will be deployed on a floating platform or a stationary platform, (3) submit a bird-and-bat-impact mitigation plan that includes a collision-monitoring plan, and (4) decide on a specific collision-detection technology that will be used to collect data regarding the impact on birds and bats after the project becomes operational. Rather than requiring Icebreaker to resolve those matters before issuing the certificate, the board determined that the conditions on its grant of the certificate were sufficient to protect birds and bats and to ensure that the facility represented the minimum adverse environmental impact.

**{¶ 38}** The residents challenge the board's deferral of those requirements, arguing that without them, the board lacked sufficient evidence to determine that the project represented the minimum adverse environmental impact under R.C. 4906.10(A)(3). They contend that the board could not have made this determination given Icebreaker's failure to submit the preconstruction radar data and its failure to identify a suitable technology to monitor bird and bat activity at the project site and detect collisions with the wind turbines. The residents maintain that it was Icebreaker's burden to submit this information before the board granted the certificate and that the board erred in granting the certificate "subject to pre-construction radar and collision monitoring conditions that the Board contends will allow it to later" make the mandatory determination under R.C. 4906.10(A)(3). We reject these arguments for the following reasons.

### a. The board's decision imposing conditions on its grant of the certificate is consistent with our precedent

{¶ 39} We have upheld the board's practice of imposing conditions on wind-farm construction certificates. *See, e.g.*, *In re Application of Buckeye Wind, L.L.C.*, 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, ¶ 16-18 (lead opinion); *see also In re Application of Duke Energy Ohio, Inc.*, 166 Ohio St.3d 438, 2021-Ohio-3301, 187 N.E.3d 472, ¶ 52 (reaffirming the board's authority under R.C. 4906.10(A) to impose conditions on natural-gas-pipeline construction certificates). In *Buckeye Wind*, a group of landowners neighboring a proposed wind farm challenged the board's decision granting a certificate to the wind farm's developer to build 70 wind turbines. *Id.* at ¶ 3-4. When the board approved the certificate, it required the developer to resolve several disputed issues before a preconstruction conference with the board's staff. *Id.* at ¶ 14. Among other things, the board authorized its staff to (1) approve new sites for three turbines, (2) review and accept plans regarding the design and siting of electric-collection lines, (3) determine the maximum potential distance that a dislodged turbine blade could be thrown, and (4) determine the specific model of wind turbine to be used. *Id.*

{¶ 40} Each of those deferred issues related to and affected the facility's environmental impact under R.C. 4906.10(A)(2) and (3). We determined that the board had not been required to resolve the issues before the certificate was issued, because R.C. 4906.10(A) expressly allows the board to issue a certificate subject to such conditions as it considers appropriate. *Buckeye Wind, L.L.C.* at ¶ 16. We explained that R.C. 4906.10(A) "authorize[s] a dynamic process that does not end with the issuance of a construction certificate." *Id.* And we noted that "[t]he General Assembly vested the board with authority to allow its staff to monitor [the applicant]'s compliance with conditions that the board has set, conditions upon which [the parties opposing the application] already had the chance to be heard." *Id.*

14

### b. The board properly considered the factors in R.C. 4906.10(A)(3)

**{¶ 41}** Although the residents concede that *Buckeye Wind* applies here, they argue that the board misapplied our precedent in that case by failing to "study the factors listed in" R.C. 4906.10(A) before granting the certificate. According to the residents, the board's decision granting the certificate subject to conditions to be reviewed later shows that the board lacked the evidence necessary to make a determination under R.C. 4906.10(A)(3).

**{¶ 42}** Contrary to the residents' claim, the board did consider the requirements of R.C. 4906.10(A)(3) before granting the certificate. By requiring that the board determine that "the facility represents the minimum adverse environmental impact," the statute directs the board to "consider[] the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations." *Id.* Among other considerations, the board found that Icebreaker's moving the project further away from the shore and the small scale of the project minimized several potential adverse environmental impacts on wildlife.

**{¶ 43}** The board also considered specific measures that were designed to minimize the adverse environmental impact on birds and bats at the project site. For example, the board required Icebreaker to submit a radar-monitoring plan prior to construction that includes pre- and postconstruction monitoring and produces a minimum percentage of viable monitoring data. The board also required Icebreaker to install fully functioning collision-monitoring technology prior to operation. The board allowed Icebreaker to delay choosing a specific collision-monitoring technology in order "to ensure the latest technologies and advancements are being utilized at the project." And to limit the risk to birds and bats, the board required

specific and expedited mitigation measures (including turbine-shutdown requirements) in case of a significant mortality event[1] or equipment failure.

{¶ 44} The residents have not shown that the board's decision to issue the certificate subject to conditions was unlawful or unreasonable. The board acted within its authority when it imposed conditions on its grant of the certificate. And the board thoroughly considered the requirements of R.C. 4906.10(A)(3) before it issued the certificate subject to the conditions.

*4. Whether the board erred in removing the condition for mandatory shutdown*

{¶ 45} The residents argue that the board acted unlawfully and unreasonably when it removed the requirement for mandatory turbine shutdown on rehearing. According to the residents, the record establishes that without the turbine-shutdown mandate, the board could not determine that the project represents the minimum adverse environmental impact. We disagree.

### a. The turbine-shutdown mandate: Its nature and the board's reasons for removing it

{¶ 46} The revised stipulation provided the board's staff and ODNR with authority to "feather" (i.e., shut down) the turbines during nighttime hours from March 1 through January 1 in the event that the collision-detection system employed at the project site failed to accurately detect collisions. This ten-month period covered the spring and fall peak-migration periods and the summer residency period, when migrating birds and bats are at their highest risk of harm by facility operations.

{¶ 47} In the May 21, 2020 order, the board imposed a different risk-mitigation measure, requiring Icebreaker to shut down the turbines during nighttime hours from March 1 through November 1. The board reasoned that it was necessary to shut down the turbines at the specified times upon commencement

---

1. Hazelton defined a significant mortality event as 21 detected collisions, facility-wide, within a 24-hour period.

of operations due to (1) the lack of data regarding the actual impact on birds and bats at the project site, (2) the uncertainty concerning the postconstruction collision-monitoring technology, and (3) the fact that the project would be the first offshore wind-farm project in Ohio. Under the order, however, Icebreaker could seek less restrictive operating limits after gathering and providing the board with data regarding the flight patterns of migrating birds and bats in the project area.

{¶ 48} On rehearing, the board changed course and determined that the turbine-shutdown mandate would be removed, "provided that, prior to any construction or operation of the [p]roject, the [b]oard * * * address[es] the bird and bat risk mitigation measures that shall apply to this project." Power Siting Bd. No. 16-1871-EL-BGN, at ¶ 30 (Oct. 8, 2020). The board noted that "[p]ursuant to R.C. 4906.10(A)(3), the proposed facility must represent the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, along with other pertinent considerations." Id. at ¶ 31. The board thus determined, after further review, that it was unnecessary to impose the shutdown mandate because its order had set forth a process to ensure that prior to and during operation of the facility, the necessary information would be provided to the board for its review and approval. Id. at ¶ 30-32, 36. Based on that process and the supervision that it calls for, the board was persuaded that the shutdown mandate could be eliminated without detracting from any effort to establish the risk-mitigation protocols that will apply to the project.

### b. The residents fail to show error in the board's decision

{¶ 49} In arguing that the shutdown mandate was necessary for the board to determine that the project satisfied the requirements of R.C. 4906.10(A)(3), the residents rely exclusively on the board's staff report of investigation and the testimony of staff witness Hazelton. The staff report did conclude that the shutdown mandate was critical to assuring that the project would not significantly

impact birds and bats, at least until there was sufficient preconstruction radar data and an effective postconstruction monitoring plan. But that evidence is not persuasive, because the staff changed its position on the shutdown mandate when it joined the revised stipulation, which did not recommend the shutdown as a condition to issuing the certificate. And in supporting the revised stipulation, staff members testified that the shutdown condition contained therein (providing staff and ODNR with discretion to determine when turbines are to be shut down), coupled with other stipulated conditions, was sufficient to satisfy R.C. 4906.10(A)(3). Based on this evidence, the residents have failed to show that the board erred in its decision.

*5. Conclusion: Proposition of law No. 1*

{¶ 50} The project, if completed, would be the first freshwater offshore wind-powered electric-generation facility in North America. That the board employed a flexible standard in granting the requested certificate poses no legal problem—"an agency, particularly when facing new issues, may proceed on an incremental, case-by-case basis," *Buckeye Wind, L.L.C.*, 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, at ¶ 33.

{¶ 51} In summary, the board determined that Icebreaker's evidence and the conditions imposed under the revised stipulation showed sufficient compliance with the statutory requirements. On appeal, it is the residents' burden to show that the board erred, but the residents have failed to do so. Accordingly, we reject the residents' first proposition of law.

**B. Proposition of law No. 2: Whether the board's decision to issue the certificate violated the public-trust doctrine and, by extension, R.C. 4906.10(A)(6), because the project does not serve the public interest, convenience, and necessity**

{¶ 52} The residents claim that the board's decision to grant the certificate to Icebreaker violated the public-trust doctrine and thus the project does not serve

18

the public interest, convenience, and necessity under R.C. 4906.10(A)(6). The residents argue that the public-trust doctrine prohibits the state—and the board as its agent—from relinquishing its ownership interest in Lake Erie to the benefit of a private, for-profit entity such as Icebreaker.

{¶ 53} The public-trust doctrine provides that the state of Ohio holds title to the land under Lake Erie within the territorial limits of the state as trustee for the benefit of the people of Ohio. *Squire*, 150 Ohio St. 303, 82 N.E.2d 709, at paragraphs one and two of the syllabus. The state "may, by proper legislative action, carry out its specific duty of protecting the trust estate and regulating its use." *Id.* at paragraph two of the syllabus. In effect, the public-trust doctrine imposes an affirmative duty on the part of the state to protect the natural resources and navigable waters of Lake Erie for the public.

{¶ 54} The residents raised their public-trust argument to the board in their posthearing reply brief. The board rejected the argument on multiple grounds. First, the board determined that whether the project violates the public-trust doctrine is a question for judicial determination that is outside the board's jurisdiction. Second, the board determined that the project did not violate the public-trust doctrine, because the state was not relinquishing any interest in Lake Erie. The board noted that the project is subject to a submerged-land lease between the state (through ODNR) and Icebreaker. According to the board, the terms of the lease required Icebreaker to respect the public's right to the free and unrestricted use of the waters and its right of navigation in and around the facility. In addition, the board reiterated that it had already examined the potential impact of the facility on the lake, including any effects on recreational activities. Based on its review, the board determined that due to the project's small scale and its location at least eight miles offshore, the project was expected to have a minimal impact on the public's enjoyment of Lake Erie.

**{¶ 55}** Here, the residents argue that the board erred in determining that it lacked jurisdiction to consider whether the project violated the public-trust doctrine. They claim that the board has authority to determine public-trust issues when it considers whether "[a] facility will serve the public interest, convenience, and necessity" under R.C. 4906.10(A)(6).

**{¶ 56}** The residents, however, point to no language in R.C. 4906.10(A)(6) that gives the board authority to make public-trust determinations concerning Lake Erie. The board, as a creature of statute, may exercise only those powers that the General Assembly confers on it. *In re Black Fork Wind Energy, L.L.C.*, 156 Ohio St.3d 181, 2018-Ohio-5206, 124 N.E.3d 787, ¶ 20. Yet R.C. 4906.10(A)(6) makes no mention of any obligation of the state to hold the waters and submerged land of Lake Erie in trust for the people of Ohio. We may not add words to a statute to achieve a desired construction. *In re Application of Columbus S. Power Co.*, 147 Ohio St.3d 439, 2016-Ohio-1608, 67 N.E.3d 734, ¶ 49. If the General Assembly intended to vest the board with authority to make public-trust determinations regarding Lake Erie, it could have chosen words to that effect.

**{¶ 57}** Moreover, the power to administer the public-trust doctrine is expressly designated to ODNR. *See* R.C. 1506.10 (declaring that the waters and submerged land of Lake Erie "belong[] to the state as proprietor in trust for the people of the state" and designating ODNR "as the state agency in all matters pertaining to the care, protection, and enforcement of the state's rights designated in [R.C. 1506.10]"); R.C. 1506.11(A) and (B) (authorizing ODNR's director to regulate the use of Lake Erie through leases of "all or any part of the state's interest" in the lake's waters and underlying lands); *see also State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 130 Ohio St.3d 30, 2011-Ohio-4612, 955 N.E.2d 935, ¶ 51-55. And contrary to the residents' assertion, the General Assembly has clearly allowed for both private and public uses of Lake Erie. Specifically, R.C.

1506.11(B) provides that "*any person* who wants to develop or improve part of the territory" may file an application for a submerged-land lease. (Emphasis added.)

{¶ 58} The provisions noted above show that the General Assembly acted to protect the public trust in Lake Erie and vested those duties in ODNR. As a result, the board's authority under R.C. 4906.10(A)(6) does not extend to the power to make public-trust determinations. Accordingly, we hold that the board did not err in determining that it lacked jurisdiction to consider the residents' public-trust argument.

## IV. CONCLUSION

{¶ 59} For the foregoing reasons, we affirm the board's order granting the certificate to Icebreaker.

Order affirmed.

O'CONNOR, C.J., and FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

KENNEDY, J., dissents, with an opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 60} The General Assembly has not created a statutory exception to R.C. 4906.10's requirements for granting a certificate of environmental compatibility and public need for the construction, operation, and maintenance of electric-generation facilities that are "demonstration projects." Therefore, appellee, the Ohio Power Siting Board, lacked authority to grant intervening appellee, Icebreaker Windpower, Inc., a certificate to build an offshore wind farm in Lake Erie without first making all the findings that are required for certifying a major utility facility.

{¶ 61} R.C. 4906.10(A) prohibits the board from granting a certificate for the construction, operation, and maintenance of a major utility facility unless it determines, among other things, "[t]he nature of the probable environmental impact," R.C. 4906.10(A)(2), and "[t]hat the facility represents the minimum

21

adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations," R.C. 4906.10(A)(3). Icebreaker's proposed facility would be the first freshwater offshore electric-generation wind-farm project in the United States, and for that reason, it is not currently possible to know all of the facility's probable impacts on the environment. And only after first determining the impact that the facility will likely have on the environment, including its impact on aquatic and avian wildlife, can the board determine whether the facility represents the minimum adverse environmental impact, considering the state of available technology and the viability of alternatives.

{¶ 62} Without additional information, the probable environmental impact of constructing a wind farm in Lake Erie is unknown, and the board's order granting a certificate to Icebreaker was unreasonable and unlawful. Therefore, I would reverse the board's order granting the certificate. Because the majority does not, I dissent.

**Standard of Review**

{¶ 63} We apply the same standard of review to an order of the board that we apply to an order of the Public Utilities Commission of Ohio. *In re Application of Duke Energy Ohio, Inc.*, 166 Ohio St.3d 438, 2021-Ohio-3301, 187 N.E.3d 472, ¶ 11, citing R.C. 4906.12. "Under this standard, we will reverse, vacate, or modify a board order 'if, upon consideration of the record, [we are] of the opinion that such order was unlawful or unreasonable.' " (Brackets added in *Duke Energy Ohio*.) *Id.*, quoting R.C. 4903.13. "We 'will not reverse or modify a board decision as to questions of fact when the record contains sufficient probative evidence to show that the board's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.' " *Id.*, quoting *In re Application of Champaign Wind,*

*L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, ¶ 7.  We review legal questions de novo.  *Id.*

### R.C. 4906.10(A)

**{¶ 64}** At issue in this case are R.C. 4906.10(A)(2) and (A)(3), which provide that the board may not grant a certificate for the construction, operation, and maintenance of a major utility facility unless the board first "finds and determines," among other requirements, the following:

> (2) The nature of the probable environmental impact; [and]

> (3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations.

Reviewing the meaning of these provisions returns us to a familiar place: statutory construction.  As we explained long ago, "[t]he question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus.  "When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said." *Jones v. Action Coupling & Equip., Inc.*, 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12.

### The Nature of the *Probable* Environmental Impact

**{¶ 65}** Here, R.C. 4906.10(A)(2) required the board to find and determine the nature of the *probable* environmental impact of constructing, operating, and maintaining the proposed wind farm in Lake Erie.  Something is "probable" when it is "based on or arises from adequate fairly convincing though not absolutely

conclusive intrinsic or extrinsic evidence or support." *Webster's Third New International Dictionary* 1806 (1993). It is "probable" if it "can reasonably and fairly convincingly be accepted as true, factual, or possible without being undeniably so." *Id.* The word "probable" "applies to that which is so supported by evidence that is adequate although not conclusive or by reason that it is worthy of belief or acceptance." *Id.*

{¶ 66} In this case, the board did not find and determine the nature of all the probable environmental impacts of Icebreaker's proposed wind farm. As the majority points out, the most contentious question before the board was the proposed facility's probable environmental impact on wildlife, including birds and bats. Yet in discussing the proposed facility's environmental impact, the board "recognized that the actual quantifiable impact [on birds and bats] *is still unknown*." (Emphasis added.) Power Siting Bd. No. 16-1871-EL-BGN, ¶ 105 (May 21, 2020). According to the board, that did not preclude it from granting the certificate because, in its view, R.C. 4906.10(A)(2) tasked it "with identifying the nature of the probable impact, not the actual impact." *Id.* at ¶ 107. The board essentially assumed that the actual environmental impact of the project could be addressed later.

{¶ 67} However, the board's distinction between probable impact and actual impact is a false one. The difference between a probable impact and an actual one is the degree of certainty and the weight of evidence supporting whether the impact will occur or has occurred. R.C. 4906.10(A)(2) requires the board to determine the actual impacts that are likely to occur, including impacts on wildlife such as avian and aquatic animals. Data about the number and density of birds and bats passing through the project area was therefore necessary to determine how those animals would be impacted by constructing a wind farm in their habitat. The board cannot simply wait and see what evidence will be generated after it grants a certificate. Rather, the board has a gatekeeping role of ensuring that the

environmental impacts of a facility are known and justified by public need *before* the facility is constructed.

{¶ 68} The majority points out that "the board generally cited myriad scientific studies submitted as evidence that monitored birds and bats flying in the vicinity of the project site and other offshore and near-shore parts of Lake Erie." Majority opinion, ¶ 17. However, those studies could not reveal the full impact of the proposed wind farm. For example, the studies that the board cited included ones in which bird and bat carcasses were retrieved from the areas beneath land-situated wind turbines and then counted. Power Siting Bd. No. 16-1871-EL-BGN, at ¶ 105 (May 21, 2020). At a basic level, such studies show that wind turbines impact wildlife by killing birds and bats. But studies quantifying the impact that onshore wind farms have on wildlife are relevant here only to the extent that all other variables in the studies are controlled, i.e., that birds and bats pass through the rotor-swept zones of offshore facilities at the same frequency and in the same concentrations as they do at onshore facilities. Such a basis for comparison was not established by the evidence before the board.

{¶ 69} According to the testimony of Dr. Henry M. Streby, an ecology professor with the University of Toledo, "[t]ens of millions to hundreds of millions of birds fly over Lake Erie during every spring and fall migration." And Dr. Streby explained, "To date, no study has been conducted that could provide a scientifically credible count or estimate of the number of birds that pass through the proposed project area during any time period." Dr. Streby opined that "adequate pre-construction monitoring of bird activity in the Project area has not been completed, rendering it impossible to make a reliable determination of the nature of the probable environmental impact of the Project on birds."

{¶ 70} Similarly, Erin Hazelton, the wind-energy administrator for the Ohio Department of Natural Resources, Division of Wildlife, who coauthored the staff's report of its investigation regarding the proposed facility, disputed Icebreaker's

assessment that the proposed project would pose only a "low risk" to migratory birds and bats. When asked whether she believed that "th[e] project is anything other than low risk to migratory birds and bats," Hazelton testified, "[W]e don't have the required data concerning pre-construction surveys, [so] it's really difficult to determine that now. So it may be accurate. It's also possible that it's not entirely accurate." The board's staff report further noted that "there are still elements of avoidance, attraction, and/or displacement that cannot be evaluated until the project is constructed."

{¶ 71} In an attempt to quantify the environmental impact of the proposed facility, Icebreaker relied in part on a review of aerial surveys of birds flying over Lake Erie. But these surveys tracked larger sea birds and were conducted by flying an airplane across Lake Erie 29 times in a zigzag pattern between the Ohio shore and the Canadian international boundary. During the flights, observers counted the birds they saw over 664 miles of travel. However, Lake Erie's surface area is about 10,000 square miles. The reliability of the results of these flyovers was therefore limited by the small area that each flight covered, the limited ability to observe the birds and bats (due to their size, their colors and the color of the water, and their behaviors), meteorological factors such as the weather, and the heights of waves. Naturally, these surveys could detect only relatively large birds, and birds could not be accurately observed at night, despite that (as the majority points out) the proposed wind farm was expected to primarily impact nocturnally migrating birds and bats. These aerial studies provide little evidence quantifying the risk that the proposed wind farm would pose to wildlife.

{¶ 72} The bird-and-bat risk assessment submitted by Icebreaker noted that data from a NEXRAD weather-radar analysis of birds and offshore acoustic studies of birds and bats revealed that "bats and many nocturnally migrating birds regularly transit the Project area." But as Dr. Streby pointed out, avian radar-detection systems provide more useful data than NEXRAD weather-radar sweeps, because

NEXRAD radar does not encompass the rotor-swept zone and is not designed to monitor migratory animals—it generally cannot track or quantify low-flying animals. Dr. Streby provided evidence that "as early as 2010 the [United States Fish and Wildlife Service] informed Icebreaker of the inappropriateness of NEXRAD radar data for quantifying the use of the proposed project site by migratory birds in the spring and fall." Icebreaker's risk assessment admitted that "[t]he extent to which nocturnally transiting bird and bat migrants may exhibit either avoidance or attraction to the facility is impossible to predict with preconstruction data." And it stated that although "[b]irds and bats are known to collide with wind turbine blades causing injury or death[,] * * * [l]ess is known about collision rates at offshore wind energy facilities."

{¶ 73} Moreover, Icebreaker's bird-and-bat-monitoring plan recognized that "[d]ue to the unprecedented nature of this demonstration project, protocols for determining potential impacts to birds and bats in an offshore environment have not been previously established for the Great Lakes." That plan explained that "[i]t is critical that sufficient and accurate data are collected pre- and post-construction in order to evaluate risk of the Project to avian and bat species." This is exactly the type of data that the board needed in order for it to find and determine the probable environmental impact of the proposed wind farm, and such data was not submitted to the board.

{¶ 74} The board granted the certificate of environmental compatibility and public need even though the data needed to quantify the project's impact on birds and bats had not yet been collected and would not be collected until after construction of the wind farm. The board therefore failed to require Icebreaker to provide sufficient evidence showing the probable environmental impact of the proposed wind farm. Because the board did not have sufficient evidence by which to determine the nature of the probable environmental impact of the project, the board should have denied Icebreaker's application for a certificate.

**The Minimum Adverse Environmental Impact**

**{¶ 75}** The board's failure to determine the nature of the proposed wind farm's probable environmental impact also precluded it from making the finding required under R.C. 4906.10(A)(3), which conditions the granting of a certificate for the construction, operation, and maintenance of a major utility facility on "the facility['s] represent[ing] the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations." The board cannot find that the project represents the minimum adverse environmental impact without first establishing the environmental impacts that the facility is likely to have.

**{¶ 76}** The board's finding that the project satisfies R.C. 4906.10(A)(3) is erroneous for another reason: the board's decision to grant the certificate relied on technology designed to minimize the environmental impact that does not currently exist and is expected to be identified and developed sometime in the future.

**{¶ 77}** R.C. 4906.10(A)(3) does not prohibit the board from approving proposed facilities that will have some environmental impact. Rather, the provision requires the board to ensure that the proposed facility will minimize adverse environmental impact when it is technologically and economically feasible to do so. But here, the board found that the proposed wind farm would have a minimum environmental impact by relying on a state of technology that currently does not exist.

**{¶ 78}** For example, the board required Icebreaker to use a collision-detection system so that the turbines could be feathered in the event that a specified number of birds and bats collide with the turbines' rotors within a 24-hour period. Power Siting Bd. No. 16-1871-EL-BGN, at ¶ 152 (May 21, 2020). Yet it acknowledged that "no specific technology has been chosen to date because [Icebreaker] wants to ensure the latest technologies and advancements are being utilized at the project, consistent with the intent of the statutory criterion to consider

'the state of available technology' and 'other pertinent considerations,' including the fact that the application requests approval of a demonstration project." *Id.* at ¶ 157, quoting R.C. 4906.10(A)(3). The board reasoned that "a portion of the initial demonstration will be used to determine the collision monitoring technology's detection efficiency." *Id.* at ¶ 158. That is so, it explained, because "the ability to calculate and assess the actual environmental impact relies on technology and data that is, to an extent, unknown." *Id.* at ¶ 160. The board continued: "[T]his is to be expected given the unprecedented nature of this project and that the purpose of this demonstration project is to explore these uncertainties." *Id.* And Icebreaker's bird-and-bat-monitoring plan recognized that "no proven effective technologies to perform bird/bat collision monitoring at offshore wind energy facilities are currently available."

{¶ 79} But nothing in R.C. 4906.10(A)(3) permits the board to grant a certificate based on unproven technology, nor does it envision a "process allowing Staff to make the ultimate determination of whether the project represents the minimum adverse environmental impact, without Board oversight or a public hearing, after the Board's issuance of the certificate," Power Siting Bd. No. 16-1871-EL-BGN, at ¶ 138 (May 21, 2020). Yet that is what the board's order contemplates. *See id.* at ¶ 152 (conditioning the grant of the certificate on "the collision-detection technology [being] demonstrated to [the Ohio Department of Natural Resources'] satisfaction through lab and field testing prior to start of construction"); *id.* ("[the Ohio Department of Natural Resources] and Staff will have the authority to direct mandatory feathering from March 1 through January 1, during all nighttime hours, in the event the collision-detection system does not accurately detect collisions").

**There Is No Exception for "Demonstration Projects" in R.C. 4906.10**

{¶ 80} The board essentially held Icebreaker's proposed wind farm in Lake Erie to a lesser degree of scrutiny because, "as a first-of-its-kind project[,] the actual

impacts of the facility are, naturally, still unknown." Power Siting Bd. No. 16-1871-EL-BGN, at ¶ 2 (May 21, 2020). The board explained that "as an unprecedented demonstration project, unknown risks are to be expected and * * * a major purpose of this project is to gather information about the impacts of an offshore wind project in the Great Lakes." *Id.* at ¶ 148. Again, it also noted that "the ability to calculate and assess the actual environmental impact relies on technology and data that is, to an extent, unknown." *Id.* at ¶ 160. Therefore, although it concluded that "the projected risk to avian and bat species associated with this small demonstration projected is expected to be low," the board "recogniz[ed] * * * that there is a considerable unknown risk associated with the number and density of birds and bats potentially migrating through the rotor-swept zone." *Id*. at ¶ 148.

{¶ 81} However, R.C. 4906.10(A)(3) does not relax the requirements for granting a certificate for "demonstration projects." The same criteria apply to all proposed major utility facilities. And the provision is phrased in the present tense: "The board shall not grant a certificate for the construction, operation, and maintenance of a major utility facility * * * unless it *finds and determines* * * * (3) [t]hat the facility *represents* the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations." (Emphasis added.) The findings that must be made before a certificate may be granted are therefore unambiguous. And if the board is unable to make those findings at the time that it reviews an application for a certificate—because the environmental impacts are uncertain or because the technology needed to minimize them is unproven—the board has no choice but to deny the application.

{¶ 82} It may make good policy to loosen the rules for an "unprecedented" project that will advance science concerning wind energy. But "as a creature of statute, the [board's] authority is limited by the statutory scheme that created it."

*Northeast Ohio Regional Sewer Dist. v. Bath Twp.*, 144 Ohio St.3d 387, 2015-Ohio-3705, 44 N.E.3d 246, ¶ 3. " '[A] fundamental principle of the constitutional separation of powers among the three branches of government is that the legislative branch of government is "the ultimate arbiter of public policy." ' " *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 59, quoting *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 21, quoting *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network, Inc. v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21. If it is necessary to "refine Ohio's laws to meet the needs of our citizens," that role belongs to the General Assembly. *Id.*

{¶ 83} In sum, the record in this case demonstrates that the board approved Icebreaker's application for a certificate of environmental compatibility and public need without making the findings required under R.C. 4906.10. It therefore erred in granting the application. Consequently, I would reverse the board's order granting the certificate. Because the majority does not, I dissent.

_____

Benesch, Friedlander, Coplan & Aronoff, L.L.P., Mark D. Tucker, and John F. Stock, for appellants.

Dave Yost, Attorney General, John H. Jones, Section Chief, and Thomas G. Lindgren, Kyle L. Kern, Cameron F. Simmons, and Katherine Walker, Assistant Attorneys General, for appellee.

Dickinson Wright, P.L.L.C., Christine M.T. Pirik, Terrence O'Donnell, Jonathan R. Secrest, Sara H. Jodka, and William V. Vorys, for intervening appellee.

Taft, Stettinius & Hollister, L.L.P., Aaron M. Herzig, and Anna M. Greve, urging affirmance for amicus curiae Great Lakes Towing Company.

Miranda Leppla, Trent Dougherty, and Chris Tavenor, urging affirmance for amicus curiae Ohio Environmental Council.

_____